**GENERADORA DE ELECTRICIDAD DEL CARIBE, INC., et al.,**
Plaintiffs,

v.

**FOSTER WHEELER CORPORATION,**
et al., Defendants.

No. Civ. 94–1405(DRD).

United States District Court,
D. Puerto Rico.

March 16, 2000.

Andres Guillemard–Noble, Nachman, Guillemard & Rebollo, San Juan, PR, Harold D. Vicente–Gonzalez, Vicente & Cuevas, Santruce, PR, for plaintiffs.

Pedro Jimenez–Rodriguez, Gonzalez Oliver, Correa Calzada, Collazo Salazar, Herrero & Jimenez, San Juan, PR, Frederick B. Lacey, LeBoeuf, Lamb, Greene & McRae, Newark, NJ, Lawrewnce W. Newman, Baker & McKenzie, New York City, Hector Reichard, Jr., Reichard & Escalera, San Juan, PR, Katarina Stipec–Rubio, San Juan, PR, for defendants.

## OPINION AND ORDER

DOMINGUEZ, District Judge.

Defendants Foster Wheeler Corporation, Foster Wheeler Power Systems, Inc., Foster Wheeler Trading Company, A.G., S.A., and Foster Wheeler Trading Company, A.G. (collectively "Foster Wheeler") have filed a motion to dismiss Plaintiffs' Complaint on several grounds. (Docket No. 206). Defendant Edmundo J. Eisen has also filed a motion to dismiss Plaintiff's Complaint, whereby Mr. Eisen adopts and incorporates the arguments made by the Foster Wheeler Defendants in their motion to dismiss. (Docket No. 205).

In essence, Defendants move for dismissal of Plaintiffs' Sixth and Seventh causes of action for failure to state a claim, FED.R.CIV.PROC. 12(b)(6), Plaintiffs' Third, Fourth, Sixth, and Seventh causes of action for failure to plead fraud with particularity, FED.R.CIV.PROC. 9(b), and Plaintiffs' entire Second Amended Complaint for failure to join an indispensable party, Corporacion Dominicana de Electricidad ("CDE"), FED.R.CIV.PROC. 12(b)(7). Plaintiffs' have opposed Defendants' motions to dismiss (Docket Nos. 208 & 209), the Foster Wheeler Defendants have replied (Docket No. 210), and Plaintiffs have surreplied (Docket No. 213). Having considered all the arguments, the Court now resolves the pending motions.

## I.

### Standards for motions to dismiss

Rules 12(b)(6) and 12(b)(1) of the FEDERAL RULES OF CIVIL PROCEDURE provide that a defendant may, in response to an initial pleading, file a motion to dismiss the complaint for lack of jurisdiction or for failure to state a claim upon which relief can be granted, respectively. It is well-settled,

**10**

however, that a complaint should not be dismissed unless it appears beyond any doubt that the plaintiff can prove no set of facts which would support a claim entitling him or her to relief. *Brown v. Hot, Sexy, and Safer Productions, Inc.,* 68 F.3d 525 (1st Cir.1995); *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 102, 2 L.Ed.2d 80 (1957); *see also Miranda v. Ponce Federal Bank,* 948 F.2d 41, 44 (1st Cir.1991). The Court must accept as true the well pleaded factual averments contained in the complaint, while at the same time drawing all reasonable inferences from the allegations in favor of the plaintiff. *See McDonald v. Santa Fe Trail Transp. Co.,* 427 U.S. 273, 276, 96 S.Ct. 2574, 2577, 49 L.Ed.2d 493 (1976); *Correa–Martinez v. Arrillaga–Belendez,* 903 F.2d 49, 51 (1st Cir.1990); *Dartmouth Review v. Dartmouth College,* 889 F.2d 13, 16 (1st Cir.1989); *Vartanian v. Monsanto Co.,* 14 F.3d 697, 700 (1st Cir.1994). However, "[b]ecause only well pleaded facts are taken as true, we will not accept a complainant's unsupported conclusions or interpretations of law." *Washington Legal Foundation v. Massachusetts Bar Foundation,* 993 F.2d 962, 971 (1st Cir.1993).

In opposing a Rule 12(b)(6) motion to dismiss, "a plaintiff cannot expect a trial court to do his homework for him." *McCoy v. Massachusetts Institute of Technology,* 950 F.2d 13, 22 (1st Cir.1991). Rather, the plaintiff has an affirmative responsibility to put his best foot forward in an effort to present a legal theory that will support his claim. *Id.* at 23 (citing *Correa–Martinez,* 903 F.2d at 52; *Dartmouth Review,* 889 F.2d 13, 16 (1st Cir.1989)); *Ryan v. Scoggin,* 245 F.2d 54, 57 (10th Cir.1957). Plaintiff must set forth in his complaint "factual allegations, either direct or inferential, regarding each material element necessary to sustain recovery under some actionable theory." *Gooley v. Mobil Oil Corp.,* 851 F.2d 513, 514 (1st Cir.1988).

With the above principles in consideration, the Court proceeds to gleen the relevant facts as alleged in Plaintiffs' Second Amended Complaint (Docket No. 96).

## II.

### Relevant Facts

The facts in the allegations, taken as truthful and making all inferences in favor of Plaintiffs, reveal that sometime on or around February of 1989, Plaintiffs Mr. and Mrs. Diaz, on their own behalf and on behalf of Plaintiff Generadora de Electricidad del Caribe, Inc. ("GEC"), and Defendants Foster Wheeler entered into a partnership agreement for the construction, maintenance and operation of an electric generating plant in the Dominican Republic. Under the agreement, Foster Wheeler was to be the exclusive builder, designer and operator of the steam and electric generating facility; was to have the option of obtaining up to a 51% ownership interest in the steam and electric generating portion of the project; further was to provide assistance and any necessary guarantees to obtain financing of the project; was to make all the pertinent assurances as to the design, equipment, construction and acceptance tests of the facility; and was to enter into a construction, operation and maintenance agreement. Mr. and Mrs. Diaz and/or their designated companies were to be responsible for providing the site for the facility and would own the facility.

Soon after the partnership agreement was entered into, all partners began investing substantial time and money towards the advancement of the partnership's purpose. Foster Wheeler, for example, tendered funds that were used to pay for permits, expenses, licenses, and work contracted or performed in Puerto Rico, among others; meetings where held between the partners and third parties who were somehow connected to the project; and the parties began to negotiate with the Government of the Dominican Republic for the sale of electricity and the construction of the generating facility. Further, in order to advance the interests of the partnership, Foster Wheeler, directly and through its subsidiaries and/or

agents, including Defendant Eisen, provided certain guarantees verifying financial solvency and further vouched Foster Wheeler's technical knowledge and capacity to design, construct, operate, maintain and guarantee the energy plant.

Around March of 1990, the negotiations with the Dominican Republic reached a stage wherein the Government of the Dominican Republic made clear its intention to enter into a contract with GEC and Foster Wheeler. Hence, the parties scheduled a meeting for March 28, 1990, in the Dominican Republic. However, a prior meeting was held in Puerto Rico on March 27, 1990. At that first meeting, Mr. Eisen, acting on behalf of Foster Wheeler, threatened Mr. Diaz and GEC with Foster Wheeler's withdrawal from the partnership and further warned of boycotting the next day's meeting in the Dominican Republic unless Plaintiffs agreed to alter terms and conditions for the partnership. Specifically, Mr. Eisen required that Plaintiffs pay Foster Wheeler Trading Company a fee and that 50% of GEC's shares and 50% of Puerto Rico Resource Recovery Leasing Corp.'s ("PRRRL") shares be paid to BHL, Ltd., an offshore corporation controlled by Mr. Eisen, all with the knowledge and consent of Foster Wheeler. Mr. Diaz, who was faced with the prospect of losing substantial amounts of previously invested money, time and effort should the project was aborted, was left with no alternative and, consequently, agreed under duress to Mr. Eisen's demands. A Stockholders Agreement was drafted or caused to be drafted by Mr. Eisen and subsequently signed by Mr. Diaz. Then, but only after Mr. Diaz had signed the document, Mr. Eisen agreed to accompany Mr. Diaz to the next day's meeting for the signing of the contract with the Government of the Dominican Republic. The agreement with the Dominican Republic was subsequently executed effective on April 18, 1990.

Thereafter, Foster Wheeler insisted on taking unilateral and exclusive control of the search for financing and for insurance through the Overseas Private Insurance Corporation ("OPIC"). Specifically, over GEC's and PRRRL's objections and after threatening once again to withdraw from the project, Foster Wheeler required that Prudential Securities, Inc., then known as Prudential Bache Securities, Inc. ("Prudential"), be retained as the exclusive financial advisor for the power plant project. Consequently, on or around November 1990, Foster Wheeler, Mr. Diaz, GEC and PRRRL entered into a written agreement with Prudential.

In the Prudential agreement, Foster Wheeler admits to have entered into a partnership agreement with PRRRL to design, build and operate with GEC a 221 MW power plant in the Dominican Republic for a final price of $170,000,000.00 and with a capital cost of up to $200,000,000.00. Moreover, as agent for the PRRRL, Foster Wheeler agreed to use its best efforts to obtain political risk insurance to meet the capital requirements. Notwithstanding, Foster Wheeler "procrastinated" and otherwise engaged in "insidious machinations" in the negotiations and signing of construction, operation and maintenance agreements, "unreasonably" and "unjustifiably" changing the terms and conditions as the negotiations proceeded. Foster Wheeler also failed to fulfill its obligations to obtain OPIC insurance and financing, did not deliver engineering plans and specifications owed to the Dominican Republic, and neglected to deliver documents promised to OPIC. Further, Foster Wheeler unduly pressured GEC and PRRRL, forcing both GEC and PRRRL to accept in February of 1991 an unwarranted increase of approximately $41 million on the construction price of the plant.

Foster Wheeler's "insidious machinations" caused Plaintiffs to incur in delays and violations of their commitment to commence the uninterrupted construction of the power plant in the Dominican Republic. Foster Wheeler and GEC consequently conceded to the renegotiation of certain prior thereto agreed upon clauses in the contract entered into with CDE. Also, in

October of 1991 Mr. Diaz was forced to request a meeting wherein Mr. Diaz, Mr. Eisen, other representatives from Foster Wheeler and representatives from Prudential discussed Foster Wheeler's delays in delivering supporting technical documents and specifications. Prudential's failure to submit reports as to Prudential's financing efforts was also discussed. Mr. Diaz further expressed concern that Foster Wheeler intended to remove GEC and PRRRL from participation in the project. Foster Wheeler's response to the loud voice of alarm was a letter dated November 29, 1991, wherein Foster Wheeler requested that PRRRL sell to Foster Wheeler its participation in the project. Mr. Diaz resisted Foster Wheeler's efforts

While all of the above related facts were occurring, Mr. Diaz continued to incur in expenses on behalf of the partnership. Under the partnership agreement, these expenses were mandated to be reimbursed by Foster Wheeler. Notwithstanding, only part of the expenses were reimbursed; and when Mrs. Diaz requested from Mr. Eisen that Foster Wheeler comply with the reimbursement, Mr. Eisen called for a meeting with Mr. and Mrs. Diaz. In this meeting Mr. Eisen demanded again that 50% of the stock in GEC, PRRRL, and Caribbean Environmental Sales and Development Inc. ("CESDI") be issued to BHL, Ltd. before Foster Wheeler reimbursed Mr. Diaz's expenses. Only after Mr. Diaz capitulated and agreed to a 40% stock transfer did Mr. Eisen and Foster Wheeler agree to the contractually mandated reimbursement.

During 1992 Foster Wheeler continued to create unwarranted barriers for the smooth construction of the power plant. Among other hurdles, Foster Wheeler was slow in complying with OPIC's request for information, unilaterally increased the price of the plant to $332 million, increased by 1.5% the fees to be paid to Prudential, and failed to deliver specifications, plans and technical data to the Dominican Republic and OPIC. In addition, when GEC attempted to obtain funds from a private investor in Florida, Mr. Eisen vetoed the investment by threatening GEC with Foster Wheeler's abortion of the project. Finally, Mr. Eisen demanded and obtained the sale of 25% of GEC's shares to Mr. Eisen's son in law, Jose Antonio Baselga, for $70,000.00, an amount lower than offered by another private investor.

On March 12, 1993, GEC arranged for a meeting with Dr. Joaquin Balaguer, President of the Dominican Republic. At that meeting, Dr. Balaguer informed Foster Wheeler, GEC, PRRRL and U.S. Ambassador Robert S. Pastorino, that the project had the wholehearted support of the Dominican Government. Foster Wheeler then announced to the press, the people of the Dominican Republic and the international community, their commitment to the power plant project. Notwithstanding, on March 30, 1993, Mr. Henry Bartoli from Foster Wheeler met with Mr. and Mrs. Diaz and GEC in Foster Wheeler's offices in New Jersey and informed that Foster Wheeler was withdrawing from the partnership. Mr. Diaz attempted to convince Mr. Bartoli that Foster Wheeler should not to withdraw; Mr. Bartoli asked for additional time to further consider the matter. The following day, on March 31, 1993, Mr. Eisen communicated with the World Bank to determine the Bank's financing feasibility for the project. When a positive response was obtained, Foster Wheeler presented Mr. Diaz and GEC with a new contract and agreement and attempted again to force Mr. Diaz to renegotiate the terms of the partnership. Foster Wheeler also attempted to obtain from Mr. and Mrs. Diaz a complete release for any claim of damages resulting from Foster Wheeler's prior actions and omissions. Mr. and Mrs. Diaz, however, balked and resisted Foster Wheeler's reiterated pressure tactics.

On April 6, 1993, representatives of Foster Wheeler and GEC met with representatives from the Dominican Government. As a result of that meeting, Mr. Eisen wrote a letter to the General Administrator of the CDE, wherein letter Mr. Eisen

once again recognized that Foster Wheeler was a party to the contract for the construction of a 221 MW plant, acknowledged Foster Wheeler's obligation to seek financing and OPIC insurance, and expressed Foster Wheeler's continued interest in the project. Nevertheless, Mr. Bartoli subsequently misinformed Mr. and Mrs. Diaz that Foster Wheeler no longer wanted to build a 221 MW plant and demanded that new terms be agreed. Mr. Bartoli also asserted to the Diaz's that the Dominican Republic was only interested in a 150 MW plant.

GEC and PRRRL rejected Foster Wheeler's demands for a modified agreement and threatened to take legal action. Also, on April 28, 1993, Mr. and Mrs. Diaz objected to granting a waiver of their potential claims against Foster Wheeler. In response, Foster Wheeler declined to proceed with the partnership and the Dominican Republic power plant project. Unbeknownst to GEC and to Mr. Diaz, however, by letter dated May 3, 1993, Mr. Eisen informed Miguel Sang Ben, Technical Secretary of the Presidency of the Dominican Republic, of Foster Wheeler's continued interest in the Dominican Republic project and that it was GEC, Mr. Diaz and PRRRL who had delayed the project's progress. The letter also falsely stated that Foster Wheeler was not a party to the agreements between GEC and the CDE; that Foster Wheeler had not accepted the terms of said agreement; that Foster Wheeler had not participated in the negotiation of said agreement; that Foster Wheeler had not entered into any agreements with GEC, PRRRL or Mr. Diaz until April of 1991; that Foster Wheeler had forwarded to Mr. Diaz all of the technical data and information required by the Dominican Republic; and that Foster Wheeler had paid Mr. Diaz $700,000.00 in cash.

On May 26, 1993, Mr. Diaz confronted and advised of a potential legal action against Mr. Eisen for his May 3rd letter to Miguel Sang Ben. Mr. Eisen admitted that the May 3rd letter contained untrue statements and offered to compensate Mr. Diaz.

Mr. Diaz initially rejected Mr. Eisen's offers. however, because of necessity and with the hope that the project would continue forward, Mr. Diaz finally accepted a loan from Mr. Eisen. Mr. Diaz, however, never released nor waived his rights.

On July 1993, Mr. and Mrs. Diaz received from Foster Wheeler the technical specifications that had been requested several months prior thereto for the Dominican Republic. Notwithstanding, Mr. Diaz was informed that he could not use the forwarded technical information.

Evidently, after all these facts transpired, the plant project collapsed.

Under the above factual scenario, on March 29, 1994, Plaintiffs filed the instant Complaint (Docket No. 1), subsequently amended on two occasions (Docket Nos. 3 & 96). In the Second Amended Complaint (Docket No. 96). Plaintiffs aver eight (8) causes of action seeking monetary damages arising out of Defendants' breach of contractual obligations, Defendants' violation of securities laws of the United States and Puerto Rico, Defendants' breach of their duty to negotiate in good faith and their fiduciary duty, and Defendant's libel and slander against Plaintiffs.

Defendants seek dismissal of Plaintiffs' Second Amended Complaint for failure to join an indispensable party, CDE, FED. R.CIV.PROC. 12(b)(7). On the alternative, Defendants argue that the Court should dismiss Plaintiffs' Sixth and Seventh causes of action for failure to state a claim. FED.R.CIV.PROC. 12(b)(6); and Plaintiffs' Third, Fourth, Sixth, and Seventh causes of action for failure to plead fraud with particularity, FED.R.CIV.PROC. 9(b).

The Court discusses first Defendants' contention that Plaintiffs have failed to join an indispensable party. Thereafter, the Court will examine the propriety and sufficiency of the challenged causes of action.

### III.

### Failure to join indispensable party

Defendants argue that the parties' efforts to build a power plant in the Dominican Republic failed because CDE walked away from the project. Without CDE's joinder, therefore, Defendants' ability to assess their liability, if any, is "severely hampered" and Defendants face the prospect of future piecemeal litigation involving CDE. Thus, Defendants request that Plaintiffs be ordered to include CDE as a party to the Complaint or that Plaintiffs' entire Complaint be dismissed for failure to join an indispensable party. *See* FED. R.CIV.PROC. 12(b)(7) and 19(a).

In response to Defendants' request, Plaintiffs argue that Defendants have not placed the Court in an adequate position to determine that CDE's joinder is indispensable. Further, Plaintiffs advance that none of the allegations of the Complaint, taken as true for the purpose of Defendants' motions to dismiss, support Defendants' position that CDE has an interest in Plaintiffs' claim or that CDE is a party whose interests may be impaired as a result of this litigation.

### A. Indispensable parties

 As a general rule, plaintiffs are entitled to decide who shall be included as parties to a litigation. Thus, compulsory joinder of a party is an exception to the general practice and should be ordered only where significant countervailing considerations make the joinder of particular absentees desirable.[1] 7 Charles A. Wright, Arthur R. Miller & Mary Kay

Kane, Federal Practice and Procedure: Civil 2d § 1602 at 18. Further, compulsory joinder or dismissal for failure to join an indispensable party should only be ordered where the movant has carried the burden of producing evidence which shows the nature of the interest possessed by the absentee and that the protection of that interest will be impaired by the absence. 5A Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 1359 (2d ed.1990), p. 427; *Citizen Band Potawatomi Indian Tribe of Oklahoma v. Collier*, 17 F.3d 1292, 1293 (10th Cir.1994) (*citing Ilan–Gat Eng'rs, Ltd. v. Antigua Int'l Bank*, 659 F.2d 234, 242 (D.C.Cir. 1981); *De Wit v. Firstar Corp.*, 879 F.Supp. 947, 992 (N.D.Iowa 1995). *Martin v. Local 147, Int'l Bro. of Painters and Allied Trades, AFL—CIO—CFL*, 775 F.Supp. 235, 236–37 (N.D.Ill.1991); *Ashley v. American Airlines, Inc.*, 738 F.Supp. 783, 788 (S.D.N.Y.1990)).[2]

Under FED.R.CIV.PROC. 19, a party is found to be indispensable if he or she meets certain criteria. First, the particular absentee must be found to be a "necessary party". Hence, the court must "decide whether considerations of efficiency and fairness, growing out of the particular circumstances of the case, require that a particular person be joined as a party." *Pujol*, 877 F.2d at 134. In practical terms, a party is "necessary" if "(1) in the person's absence complete relief cannot be accorded among those already parties, or (2) the person claims an interest relating to the subject of the action and is so situated that the disposition of the action

1. These countervailing interests are, mainly, the defendants' right to be safe from needless multiple litigation and from avoidable inconsistent obligations; the absentee's interest in the litigation; and the public interests in judicial administration and in seeing that litigation is efficient and expeditious. *See Schutten v. Shell Oil Co.*, 421 F.2d 869, 873 (5th Cir. 1970); *Provident Tradesmens Bank & Trust Co. v. Patterson*, 390 U.S. 102, 88 S.Ct. 733, 19 L.Ed.2d 936 (1968).

2. Final determination of who must be included as a party to a federal litigation is a question of federal law under FED.R.CIV.PROC. 19, *Provident Tradesmens Bank & Trust Co.*, 390 U.S. at 125 n. 22, 88 S.Ct. at 746 n. 22, and must be guided by Rule 19's principal purpose: to "involve 'as many apparently concerned persons as is compatible with efficiency and due process.'" *Pujol v. Shearson American Exp., Inc.*, 877 F.2d 132, 134 (1st Cir.1989). Generally, however, "[t]he courts are loathe to grant motions to dismiss of this type." 5A Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 1359 (2d ed.1990), p. 425.

in the person's absence may (i) as a practical matter impair or impede the person's ability to protect that interest or (ii) leave any of the persons already parties subject to a substantial risk of incurring double, multiple or otherwise inconsistent obligations by reason of the claimed interest." F.R.C.P.Rule 19(a).

If the court decides that an absent party is a "necessary party," the Court must then determine whether the "necessary party's" joinder is "feasible." This requires the court to determine whether the absentee is subject to service of process and whether the absentee's joinder will deprive the court of jurisdiction over the subject matter of the action. If joinder is feasible, the Court will order the party's joinder. If joinder is not feasible, the Court will then proceed to decide whether the party is "indispensable."

Determining whether or not a party is "indispensable" is equivalent to determining whether "in equity and good conscience the action should proceed among the parties before it, or should be dismissed." F.R.C.P.Rule 19(b). *See also Pujol*, 877 F.2d at 134; *Provident Tradesmens Bank*, 390 U.S. at 119, 88 S.Ct. at 743; *Acton Co., Inc. of Massachusetts v. Bachman Foods, Inc.*, 668 F.2d 76, 78 (1st Cir.1982). This determination must be guided by the following four (4) factors enumerated by Rule 19(b):

> [F]irst, to what extent a judgment rendered in the person's absence might be prejudicial to the person of those already parties; second, the extent to which, by protective provisions in the judgment, by the shaping of relief, or other measures, the prejudice can be avoided; third, whether a judgment rendered in the person's absence will be adequate; fourth, whether the plaintiff will have an adequate remedy if the action is dismissed for nonjoinder.

Ultimately, it is the Court that must make all final determinations on compulsory joinder of a party. Still, it is the moving party's burden to show the Court the nature of the absentee's unprotected inter-ests or the prejudice to be suffered by the movant due to the non-joined party's absence. *See Ilan–Gat Engineers, Ltd. v. Antigua International Bank*, 659 F.2d 234, 242 (D.C.Cir.1981). *See also McCann v. Ruiz*, 788 F.Supp. 109, 121 (D.P.R.1992).

**B. Application to facts**

In the first place, the Court examines whether CDE is a "necessary party." Hence, the Court examines whether CDE "claims an interest" relating to the subject of Plaintiffs' action and is "so situated" that disposition of Plaintiffs' action in CDE's absence "may as a practical matter impair or impede" CDE's "ability to protect that interest" or "leave any of the persons already parties subject to a substantial risk of incurring double, multiple or otherwise inconsistent obligations by reason of the claimed interest." FED. R.CIV.PROC. 19(a)(2)(i) & (ii). *See also Pujol*, 877 F.2d at 135. If CDE fails to satisfy this test, CDE is not even a "necessary party." If CDE does satisfy this test, however, the Court will then proceed to examine the "feasibility" of CDE's joinder and finally, if necessary, whether or not CDE is an "indispensable party."

**1. Necessary party**

One of Defendants' arguments in favor of determining CDE to be a necessary party is that "the bulk of the damages claimed are based on the revenues that would have been paid by CDE. As in *Aguilar*, the unjoined party—CDE—was the 'entity responsible' for the payments." Docket No. 210, at 10 (citing *Aguilar v. Kreiseder*, Civ. No. 95–1430(DRD) Slip Op. at 11 (D.P.R.1998), which in turn cites *Acton Co., Inc. of MA v. Bachman Foods, Inc.*, 668 F.2d 76 (1st Cir.1982)).

Unfortunately for Defendants, however, the above argument does not aid Defendants' position. Contrary to *Aguilar* and to *Acton*, if Plaintiffs' allegations in this case are ultimately proven, CDE will not be responsible for any payments to Plaintiffs. Plaintiffs are not claiming dam-

ages under their contract with CDE, but rather under the partnership agreement and the stock transactions entered into with Foster Wheeler. CDE may appear before this Court to aid Plaintiffs to quantify the damages; CDE may further appear as a witness with relevant information as to Defendant's alleged liability.[3] Therefore, Defendants' invocation of the First Circuit's ruling that "actions involving the determination of obligations under a contract 'must be dismissed unless all parties to the contract .... can be joined,'" *Aguilar,* Slip Op. at 11 (citing *Acton Co. v. Bachman Foods, Inc.,* 668 F.2d 76 (1st Cir.1982)) is inapposite and, consequently, Defendants' first argument is meritless. Of course, if Defendants are able to sustain their defense that the power plant project's failure was due to CDE's withdrawal, Defendants would benefit from including CDE as a third party defendant under F.R.C.P.Rule 15.[4] The question then would be, however, whether CDE could be joined as a Defendant, due to CDE's apparent lack of minimum contacts with this jurisdiction.

A second argument advanced by Defendants is that this case will require the Court to determine the cause for the power plant project's "total collapse." If the Court determines that CDE was primarily responsible for said collapse, as Defendants' allege in their defense, CDE will be prejudiced by the Court's adverse ruling even if the ruling is not binding against it. *See Acton,* 668 F.2d at 79 (even if the unjoined party is not legally bound by the adverse ruling, "an adverse ruling would be persuasive in a subsequent proceeding and would weaken [the party's] bargaining position for settlement purposes").

The fact that CDE may have an interest in the litigation does not make CDE a necessary party. As was stated by the First Circuit, "The mere fact [ ] that Party A, in a suit against Party B, intends to

introduce evidence that will indicate that a non-party, C, behaved improperly does not, by itself, make C a necessary party." *Pujol,* 877 F.2d at 136. Moreover, in this case it is Defendants who, for the first time, suggest that CDE may have contributed or caused the power plant project's failure, for none of Plaintiffs' allegations can be read as imputing upon CDE any participation in the failure. On the contrary, Plaintiffs' allegations, taken as true for the purpose of Defendants' motion to dismiss, reveal that Defendants were the exclusive tortfeasors that prevented the success of the power plant project.

■ Further, even acknowledging that "an adverse ruling could, as a practical matter, impair [CDE's] success in future proceedings and reduce [CDE's] ability to reach a favorable settlement," *Gonzalez v. Cruz,* 926 F.2d 1, 6 (1st Cir.1991), this factor is not determinative. A mere theoretical possibility that a non-party's ability to reach a more favorable settlement will be affected should not be sufficient to base a finding that said non-party is a necessary part under Rule 19. To hold otherwise would result in making any join tortfeasor a necessary party under Rule 19, contrary to Supreme Court precedent and obviating the rules for permissive joinder under Rule 20. *See Temple v. Synthes Corp. Ltd.,* 498 U.S. 5, 7, 111 S.Ct. 315, 112 L.Ed.2d 263 (1990).

Finally, Defendants argue that failure to join CDE would leave any of the defendant parties to the litigation "subject to a substantial risk of incurring double, multiple or otherwise inconsistent obligations." Fed.R.Civ.P. 19(a)(2)(ii). Notwithstanding, this argument is without merits given the First Circuit's recent declaration that:

"Inconsistent obligations" are not, however, the same as inconsistent adjudications or results. Inconsistent obli-

---

**3.** Plaintiffs' damages would have to be determined taking into consideration whatever revenues Plaintiffs' would have received from CDE's payments under the power plant project.

**4.** Naturally, Defendants are also free to file an indemnity lawsuit against CDE in the adequate forum satisfying *in personam* jurisdiction requirements of minimum contacts.

gations occur when a party is unable to comply with one court's order without breaching another court's order concerning the same incident. Inconsistent adjudications or results, by contrast, occur when a defendant successfully defends a claim in one forum, yet loses on another claim raising from the same incident in another forum ... Unlike the risk of inconsistent obligations ... a risk of inconsistent adjudications or results does not necessitate joinder of all the parties into one action pursuant to Fed.R.Civ.P. 19(a).

*Delgado v. Plaza Las Americas, Inc.*, 139 F.3d 1, 3 (1st Cir.1998).

While there may be a risk of inconsistent adjudications or results in this case if Defendants are later sued by CDE and obtain a different result than in this case, the Court does not foresee the possibility that Defendants will be subject to inconsistent obligations before two different courts, nor have Defendants placed the Court in position to foresee such a possibility.

Finally, if the interests stated by Defendants in this case (Plaintiffs' interest in obtaining complete relief, avoiding piecemeal litigation, CDE's presumable interest in defending itself in an action which it might be found to have been negligent, and the possibility of preventing the impairment of CDE's interests in subsequent litigations) are as important to Defendants as their motion to dismiss maintains, Defendants are free to join CDE as third party defendant without disturbing the court's subject matter jurisdiction. *See, e.g., Moor v. Alameda County*, 411 U.S. 693, 715–716, 93 S.Ct. 1785, 1798, 36 L.Ed.2d 596 (1973); *Pennsylvania R. Co. v. Erie Ave. Warehouse Co.*, 302 F.2d 843, 844 (C.A.3 1962); *Southern Milling Co. v. United States*, 270 F.2d 80, 84 (C.A.5 1959); *Dery v. Wyer*, 265 F.2d 804, 807–808 (C.A.2 1959); *Waylander–Peterson Co. v. Great Northern R. Co.*, 201 F.2d 408, 415 (C.A.8 1953). Of course, the questions will then be whether the Court will have *in personam* minimum contacts jurisdiction over CDE, since a reading of the allegations does not suggest that CDE has had minimum contacts in this jurisdiction.[5]

Defendants' motions to dismiss for failure to join an indispensable party is **DENIED.**

## IV.

### Allegations of fraud

Defendants move for the dismissal of Plaintiffs' Third, Fourth, Sixth and Seventh causes of action for failure to plead fraud, or "dolo" under P.R.Laws Ann. tit. 31, § 3018, with particularity as required by FED.R.CIV.PROC. 9(b) and despite three (3) previous opportunities granted by the Court. Plaintiffs respond arguing that their Second Amended Complaint did include particular allegations of fraud or "dolo", including allegations of time, place and date. Plaintiffs then discuss each one

---

**5.** It appears uncontested that CDE's joinder would not destroy the Court's subject matter jurisdiction. Plaintiffs have invoked both diversity and federal question jurisdiction and, although this opinion dismisses Plaintiffs' federal cause of action, diversity jurisdiction would be left untarnished by CDE's joinder. CDE is a Dominican corporation and none of the current parties to the suit are Dominican residents or citizens. Notwithstanding; as stated above, the Court lacks sufficient information to determine whether CDE is subject to minimum contacts *in personam* jurisdiction.

It is well settled that "the district court's personal jurisdiction [minimum contacts] over a nonresident is governed by the forum's long-arm statute." *Sawtelle v. Farrell*, 70 F.3d 1381, 1387 (1st Cir.1995) citing from *Goldman, Antonetti, Ferraiuoli, Axtmayer & Hertell v. Medfit Int'l, Inc.*, 982 F.2d 686 (1st Cir.1993). *See also Ticketmaster–New York, Inc. v. Alioto*, 26 F.3d 201 (1st Cir.1994) (the district court must find sufficient contacts between the defendant and the forum in order to satisfy the State's long-term statute and to comply with the Fourteenth Amendment's due process clause). As to the local long-arm statute, see *Cruz v. Ortho Pharmaceutical Corp.*, 619 F.2d 902 (1st Cir.1980) (describing the three-prong test applied by the Supreme Court of Puerto Rico in *A.H.H. Thomas v. Superior Court*, 98 P.R.R. 864, 1970 WL 23801 (1970)).

of the causes of action where fraud or "dolo" is alleged and provide additional facts to support their original claims of fraudulent behavior.

## A. Legal framework—pleading of fraud particulars

In federal diversity cases involving claims of fraud, state law governs all issues related to the substantive elements of fraud and the burden of proving fraud at trial. *P.C.M.E. Commercial, S.E. v. Pace Membership*, 952 F.Supp. 84, 88 (D.P.R.1997) citing *Erie R.R. v. Tompkins*, 304 U.S. 64, 78, 58 S.Ct. 817, 822, 82 L.Ed. 1188 (1938); *Borschow Hosp. & Medical Supplies v. Cesar Castillo*, 96 F.3d 10, 15 (1st Cir.1996); *Hopgood v. Merrill Lynch, Pierce, Fenner & Smith*, 839 F.Supp. 98, 104 (D.P.R.1993); *Marina Industrial, Inc. v. Brown Boveri Corp.*, 114 P.R. Dec. 64, 72 (1983). Federal law, however, governs the procedure and requirements for pleading fraud. Hence, FED.R.CIV.PROC. 9(b) requires a plaintiff invoking fraud to plead with particularity the "circumstances constituting fraud," meaning that "the complaint must set forth 'specific facts that make it reasonable to believe that defendant[s] knew that a statement was materially false or misleading.'" *Serabian v. Amoskeag Bank Shares, Inc.*, 24 F.3d 357 (1st Cir.1994) (citations omitted). Further, in order to survive a motion to dismiss for failure to plead fraud with particularity, the plaintiff must have included specific pleadings as to time, place and contents of the false representations, as well as the identity of the person or persons making the misrepresentation and what the person or persons obtained thereby. *See McGinty v. Beranger Volkswagen, Inc.*, 633 F.2d 226, 228–229 (1st Cir.1980); *Verrecchia v. Paine, Webber, Jackson and Curtis*, 563 F.Supp. 360, 363 (D.P.R.1982).

In general, but more so in the securities context,[6] the First Circuit has applied Rule 9(b) strictly. *New England Data Services v. Becher*, 829 F.2d 286, 288 (1st Cir.1987).

Thus, the First Circuit has ruled that "under section 10(b), plaintiffs must plead specific facts giving rise to a 'strong inference' of fraudulent intent." *Maldonado v. Dominguez*, 137 F.3d 1, 9 (1st Cir.1998) (citations omitted). Moreover, " 'Courts have uniformly held inadequate a complaint's general averment of the defendant's 'knowledge' of material falsity unless the complaint also sets forth specific facts that make it reasonable to believe that defendant knew that a statement was false or misleading.'" *Id.* "[M]ere allegations of fraud, corruption or conspiracy, averments to conditions of mind, or referrals to plans and schemes are too conclusional to satisfy the particularity requirement, no matter how many times those accusations are repeated." *Hayduk v. Lanna*, 775 F.2d 441, 444 (1st Cir.1985) (citations omitted).

Under Puerto Rico's contract law, fraud which affects a contracting party is commonly referred to as "dolo" or deceit, *Fournier v. Eastern Airlines, Inc.*, 655 F.Supp. 1037, 1038–1039 (D.P.R.1987), and can be manifested in one of two situations, *Marquez v. Torres Campos*, 111 D.P.R. 854, 863, 1982 WL 210682, Vol. 11 P.R.S.Ct. Official Trans. 1085, 1056 (1982). First, "dolo" can be manifested in the "formation" of a contract where a party obtains the consent of another through deceptive means. *See* P.R.Laws Ann. tit. 31, §§ 3404 to 3409. *See also P.C.M.E. Commercial v. Pace Membership Warehouse, Inc.*, 952 F.Supp. 84, 92 (D.P.R.1997). Second, "dolo" can be manifested in the "performance" of a contractual obligation where a party, knowingly and intentionally, through deceitful means, avoids complying with its contractual obligation. *See* P.R.Laws Ann. tit. 31, §§ 3018 & 3019. *See also Marquez*, 111 D.P.R. at 863, Vol. 11 P.R.S.Ct. Official Trans. at 1097. Whatever the case, "dolo", like fraud, is not to be presumed and must be proven by the person making the pleading. *Miranda Soto v. Angela Mena*, 109 D.P.R. 473, 478,

---

**6.** Plaintiffs have averred a cause of action under Section 10(b) of the Securities and Exchange Act, 15 U.S.C. § 78j(b) and Rule 10b–

5 of the Securities Commission, 17 C.F.R. 240 10b–5.

1980 WL 138572, Vol. 9 P.R.S.Ct. Official Trans. 628, 634 (1980); *Canales v. Pan American,* 112 D.P.R. 329, 338, 1982 WL 210645, Vol. 12 P.R.S.Ct. Official Trans. 411, 423 (1982); *Citibank v. Dependable Ins. Co., Inc.,* 121 D.P.R. 503, 519, 1988 WL 580806, Vol. 21 P.R.S.Ct. Official Trans. 496, 512 (1987). *See in general* Manresa, *Comentarios al Código Civil Español,* 6ta ed., Madrid, Ed. Reus, 1967, T. 8, Vol. 1, pgs. 172, 209–211.

Notwithstanding the above, fraud and "dolo" are not synonymous concepts and must not be treated as such by this Court. Although the distinction is subtle, Puerto Rico's Supreme Court has described "dolo" as the genus and fraud as one of several species alongside with deceit, false representations, undue influence, and other insidious machinations. *Marquez,* 111 D.P.R. at 863, Vol. 11 P.R.S.Ct. Official Trans. at 1096.[7] It follows, then, that a fact pattern involving contract fraud will always involve "dolo", but a fact pattern involving "dolo" will not always involve fraud. The concept of "dolo", therefore, includes fraud as its most heightened species, but also includes other less heightened modes such as "undue influence" and "insidious machination". Indeed, "dolo" may be manifested by the presence of malice or intent without accompanying false representations, belief in false representations, or detrimental reliance. Such would be the case of a party who contracts or performs a contract through undue influence or with insidious machinations, but not with fraud. Thus, the subtle difference between "dolo" and fraud cannot be overlooked and is determinative when applied to the pleading requirements under Rule 9(b).

The Court has examined both federal and Puerto Rican jurisprudence and treatises in search of some direction that will allow the Court to conclude whether or not Rule 9(b) applies to all allegations involving the modes of "dolo" falling short of fraud. For the most part, however, the Court's search has been disappointing. First, the Court examined Puerto Rico's pleading requirement, hoping to find that the difference between "dolo" and fraud had been addressed. Unfortunately, the Court found that Puerto Rico's pleading requirement for cases involving fraud is set forth in terms which are identical to the federal pleading requirement, overlooking the existence of the Civil law concept of "dolo". To wit, Rule 7.2 of the Puerto Rico Rules of Civil Procedure states:

> In all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated in detail. Malice, intent, knowledge, and any other attitude or condition of the mind of a person may be averred in general terms.

P.R.Laws Ann. tit. 32, App. III, R 7.4.

Second, the Court examined Puerto Rico's treatises and jurisprudence hoping to find a discussion of this legislative oversight. Notwithstanding, the Court found that Puerto Rico's jurisprudence and treatises have limited their discussion of this rule to instances where the term fraud is used. This Court did not find a single case in which Puerto Rico's Supreme Court discusses the application of Rule 7.2's pleading requirement to allegations of "dolo", nor a case in which the Court distinguished between the application of Rule 7.2 to allegations of fraud and the non-application of Rule 7.2 to allegations of "dolo". Further, this Court was also frustrated in its search for a treatise on Puerto Rico's Civil Procedure which embarked in this highly specialized, but critical task. Due to this lack of direction, this Court was forced to undertake the task unaided.

---

**7.** Further, critical to the Court's final determination, in more recent cases the Supreme Court of Puerto Rico has repeatedly enumerated fraud and "dolo" as distinct concepts with similar consequences upon the validity of a contract. *See Ortiz Nieves v. Union Carbide Grafito, Inc.,* 99 T.S.P.R. 108, * 8, 146 D.P.R. —— (1999); *Colón v. Promo Motor Imports, Inc.,* 97 T.S.P.R. 148, * 9, 144 D.P.R. —— (1997); *Velco v. Industrial Service Apparel,* 97 T.S.P.R. 71, * 5, 142 D.P.R. —— (1997); *Fernandez v. Fernandez,* 97 T.S.P.R. 8, * 4 & 13, 142 D.P.R. ——, 1997 WL 48949 (1997).

The Court has made inferences from what little guidance Puerto Rico's jurisprudence and treatises have provided and has reached its own conclusions stemming from the differences between "dolo" and fraud and a narrow interpretation of Rule 9(b)'s exceptional pleading requirement.

 Following Wright and Miller, the Court finds that "[b]y its terms, the particularity requirement in Rule 9(b) applies only to averments of fraud. Since the rule is a special pleading requirement and contrary to the general approach of simplified pleading adopted by the federal rules, its scope of application should be construed narrowly and **not extended to other legal theories or defenses.**" 4 Charles Alan Wright and Arthur R. Miller, Federal Practice and Procedure § 1297 at 615 (2d ed.1990) (emphasis added). Further, the Court finds that the concept of fraud which is present in Rule 9(b) is that which has been traditionally accepted, meaning that there is fraud where there is (1) a false representation of a material fact; (2) knowledge of or belief in the representation's falsity by the person making it; (3) belief in the representation's truth by the person to whom the representation is made; (4) intent that the representation should be acted upon; and (5) detrimental reliance upon the representation by the person claiming to have been deceived. *Id.* at pgs. 584–589. *See also Wadsworth, Inc. v. Schwarz–Nin,* 951 F.Supp. 314, 323 (D.P.R.1996); *F.C. Imports v. First Nat. Bank,* 816 F.Supp. 78, 87 (D.P.R.1993); *In re Las Colinas, Inc.,* 294 F.Supp. 582 (D.Puerto Rico 1968); *Monclova v. Financial Credit Corp.,* 83 P.R.R. 742, 747–748, 83 D.P.R. 770, 1961 WL 13765 (1961); *Carrasquillo v. Lippitt & Simonpietri,* 98 P.R.R. 659, 669, 98 D.P.R. 659, 1970 WL 23832 (1970). Of all the species comprising Puerto Rico's "dolo", only fraud meets this description. That is, where only false representations, undue influence, or other insidious machinations are present, the elements of fraud are not met even though there is present the Civil Code term of "dolo". Consequently, until otherwise directed by the appropriate authorities, only when a party's pleadings of "dolo" involve the elements of fraud as set forth above, will this Court require that party's pleadings to meet the specificity requirements of Rule 9(b). In all other instances, the Court will follow the federal rules' general pleading requirement.

### B. Application—pleading of fraud particulars

Plaintiffs' pleadings are fraught with allegations both of "dolo" and fraud. Still, the Court has not been able to find in those allegations particularized pleadings which may support Plaintiffs' claims of fraudulent behavior, thus satisfying Rule 9(b)'s pleading requirements. If anything, Plaintiffs' allegations support their contentions of "dolo" in that Defendants "negligently" and "wilfully" "breached the due care, good faith and fair dealing" owed to Plaintiffs under their partnership agreement. Third Cause of Action; "negligently" and "willfully" "interfered with the contractual relationship existing between GEC, PRRRL and the Dominican Republic, Fourth Cause of Action"; and "negligently" and "willfully" libeled and/or slandered Plaintiffs, Fifth Cause of Action. Plaintiffs allegations would also support, if applicable, any claims of coerced consent in the issuance or transfer of stock. Plaintiffs' allegations, however, regardless of how liberally they are read, fail to support Plaintiffs' bald claims of fraudulent breach of the care, good faith and fair dealing owed to Plaintiffs by Defendants; fraudulent interference with contractual relationships; or fraudulent deception concerning the issuance and purchase of stock.[8]

---

8. An example in support of the Court's conclusion can be found in paragraphs 3.12 to 3.16 of the Second Amended Complaint, where Plaintiffs relate an incident in which Mr. Eisen threatened Mr. Díaz with not showing up at a meeting in the Dominican Republic unless 50% of GEC's shares and 50% of PRRRL's shares were issued to BHL, Ltd. Plaintiffs's pleadings surrounding the narration of this incident contain no indication that Defendants made a representation of any kind in order to obtain the requested issuance of

■ As in the two examples in footnote number 8, Plaintiffs' Second Amended Complaint is replete with references to occasions where Foster Wheeler's representatives attempted to coerce or pressure Plaintiffs into engaging in a certain conduct or transaction by employing tough negotiation tactics. Plaintiffs' Complaint further contains allegations supporting claims of negligence and willful behavior, which claims may amount to a lesser manifestation of "dolo" that fails to reach the heightened species of fraud. Plaintiffs' Complaint does not have the necessary particulars to support a claim of fraud.[9] Accordingly, the Court orders that all references to fraud be struck from the Second Amended Complaint. The Court does not dismiss Plaintiffs' Third, Fourth, Sixth or Seventh causes of action on this ground as aside from their allegations of fraud, Plaintiffs did allege in support of these causes of action sufficient facts tending to show that Defendants acted negligently, willfully, and/or with "dolo".

## V.

## SECURITIES CLAIMS

Defendants move for the dismissal of Plaintiffs' Sixth and Seventh causes of action based on the applicable statutes of limitations, for failure to allege the required elements of the stated claims, and due to the inapplicability of the securities laws to the facts alleged in Plaintiffs' Second Amended Complaint.[10] Plaintiffs oppose Defendants petition for dismissal and present additional facts and new arguments in an effort to rescue their securities claims from an impending dismissal. The Court explores each of Defendants' grounds for dismissal and holds that Plain-

stock. Indeed, Plaintiffs themselves admit in the pleadings that they accepted Mr. Eisen's request because they did not want to loose the money, time and effort invested in the power plant project, not because they relied on a misrepresentation by Defendants. Therefore, Plaintiffs' only complaint can be that Foster Wheeler engaged in "hard ball" negotiations, and that Foster Wheeler may have done so with some form of malice or intention not amounting to fraud but reaching the less stringent species of "dolo".

Another example of Plaintiffs' failure to plead fraud with particularity can be found in paragraph 3.21, where Plaintiffs accuse Foster Wheeler of "procrastinating" and "otherwise engaged in insidious machinations" in the negotiations and signing of agreements. As in the previous example, Plaintiffs' allegations simply refer to "mounting pressures" and threats "to drop the project unless they capitulated." The allegations do not support a claim of fraud in Defendants' behavior, even if they support a claim of "dolo".

9. Plaintiffs' opposition to Defendants' motions to dismiss does contain specific references that could be read as accusations of fraud and intent to defraud. (Docket No. 209). Rule 9(b), however, requires that Plaintiffs include such allegations in their Complaint, not in an opposition to a dispositive motion. Further, Plaintiffs have had adequate opportunity to amend their Complaint and include said alle-

gations, particularly since early in the litigation Defendants filed a motion for particulars respecting the allegations of fraud. (See Docket No. 12.) As stated by the First Circuit in *Hayduk v. Lanna:* "Although federal courts must be liberal in allowing parties to amend their complaints, we find that dismissal of the counts after plaintiffs had two opportunities to amend their complaint was well within the discretion of the district court especially since the plaintiffs were notified before amending a second time that the allegations of fraud in their first amended complaint failed to meet the particularity requirements of Rule 9(b)." 775 F.2d 441, 445 (1st Cir.1985) (citations omitted).

10. Plaintiffs' Sixth cause of action seeks to impose liability upon Defendants under Section 10b of the Securities Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 of the Securities Commission, 17 C.F.R. § 240.10b-5. Under this claim, Plaintiffs allege that Defendants, through their actions, omissions and/or representations, intentionally deceived Plaintiffs concerning the issuance and purchase of stock in the Plaintiff Corporations and concerning Defendants' interest in acquiring the stock and performing their obligations relating thereto. Plaintiffs further allege that they relied upon Defendants' representations and were misled to agree to sell the stock and that Defendants' false representations and failure to comply with their contractual obligations caused loss and damages to Plaintiffs.

tiffs' Sixth and Seventh Causes of Action must be dismissed with prejudice.

## A. Federal statute of limitations

■ In *Lampf, Pleva Lipkind, Prupis & Petigrow v. Gilbertson,* 501 U.S. 350, 364, 111 S.Ct. 2773, 115 L.Ed.2d 321 (1991), the Supreme Court held that all claims under section 10b of the Securities Exchange Act. 15 U.S.C. § 78j(b), and Rule 10b–5 of the Securities Commission, 17 C.F.R. § 240–10b–5, must be brought within one year of discovery of the facts which give rise to the violation and no more than three years after the violation itself, without possibility of tolling. *See also Cooperativa de Ahorro y Credito Aguada v. Kidder,* 993 F.2d 269 (1st Cir. 1993). Moreover, knowledge of all the aspects of the securities violation is not essential to the running of the one year term. The required level of knowledge that a plaintiff must have before the one year term begins to run is relatively low. The time from which the one year term begins to run is not the time at which a plaintiff becomes aware of all of the elements of the alleged violation, rather the term runs from the time at which plaintiff should have discovered the general fraudulent scheme. "(T)he statutory period ... (does) not await appellant's leisurely discovery of the full details of the alleged scheme." *Klein v. Bower,* 421 F.2d 338, 343 (2d Cir.1970). *See also Arneil v. Ramsey,* 550 F.2d 774, 780 (2d Cir.1977); *Berry Petroleum Co. v. Adams & Peck,* 518 F.2d 402, 410 (2d Cir.1975).

According to Defendants' reading of Plaintiffs' Second Amended Complaint, Plaintiffs seek compensation for three separate incidents of federal securities law violations which occurred on April of 1992, August of 1991, and March of 1990. Because Plaintiffs filed their Complaint on March 29, 1994, and the alleged violations were clearly known to Plaintiffs on the same day they occurred, Defendants argue that Plaintiffs' federal securities claims are time-barred. Plaintiffs counter Defendants position with the following argument:

Since the very beginning of the relationship the Foster Wheeler Defendants conditioned their participation in the Dominican Republic project on their option to obtain a 50% ownership interest in the project; that demands for shares or participation and changes in the terms of their partnership were continuous up to April 1992; that demands were made through the use of deceptive and manipulative devices which included, among others, threats to abort the project, unreasonably and unjustifiably changing the terms of the Partnership, and/or a large enough participation in the Partnership's profits, to exercise effective control over the affairs of the Partnership (including its profits) without becoming the known or nominal owner thereof in order to evade PUCA [the "Regulations Fraud"].

By March and April 1993, Eisen and Foster Wheeler Defendants tried to force Mr. & Mrs. Gustavo Diaz to renegotiate new terms of their partnership as a condition for the Foster Wheeler Defendants continuing in the project. Finally, in May 3, 1993, Eisen wrote Miguel Sang Ben, Technical Secretary of the Presidency of the Dominican Republic, slandering Plaintiffs, thus putting an end to any possibility of the Plaintiffs realizing the project.

These concerted efforts were continuous up to April 1993. It was not until May 1993 that Plaintiffs learned the true nature of these demands, which were aimed at eliminating Mr. & Mrs. Diaz from any participation in the project. The Complaint was filed on March 29, 1994. Thus, the Sixth and Seventh Causes of Action are not time barred.

One particular demand and sale of stock, was made in April 1992. Threats were used to obtain Diaz consent to the sale. This sale was part of the "Ownership Fraud". Plaintiffs discovered the fraud in May 1993. The Complaint was filed on March 29, 1994, and thus the Complaint was filed within one year of Plaintiffs having acquired knowledge of

the fraud and within three years of the April 1992 sale of stock.

Although this theory may be sufficient to support an argument that Plaintiffs' cause of action for breach of contract did not accrue until 1993, the theory is not sufficient to support Plaintiffs' argument that their federal securities claim was not discovered until 1993. At the time of each one of Defendants' alleged demands for securities, Plaintiffs were placed on sufficient notice of a possible securities violation. Thus, even if Plaintiffs did not know all of the elements of that violation, and even if that violation was part of a greater scheme to eventually take over the Plaintiff corporations and/or to take over the business of the Dominican Republic power plant, Plaintiffs knew on March of 1990, August of 1991, and April of 1992, that Defendants were wrongfully demanding the issuance or transfer of stocks. It was on each one of those dates that Plaintiffs' causes of action accrued under federal securities laws and it was on each one of those dates that the one year term of the statute of limitations began to run.[11] The Complaint was not filed until March 29, 1994, thus, Plaintiffs' Sixth cause of action is time-barred and, consequently, **DISMISSED WITH PREJUDICE.**[12]

11. The Court notes that the federal securities laws invoked by Plaintiffs create a cause of action arising out of each stock transaction where a party employs unlawful modes for the purchase or sale of securities. Where the victim knows of the employment of said unlawful modes at the same date that the unlawful mode was employed, the cause of action accrues. To that effect, the Court further recognizes the pertinent language of Section 10b of the Securities Exchange Act and Rule 10b–5 of the Securities Exchange Commission.

Section 10b:
It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange:
(b) To use or employ, in connection with the purchase or sale of any security exchange or any security not so registered, any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

Rule 10–b5:
It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,
(a) To employ any device, scheme of artifice to defraud,
(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or
(c) To engage in any act, practice or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

12. The Court must also point out that Plaintiffs first raised their theories of "regulations" and "ownership" fraud in their opposition to Defendant's motions to dismiss and that the facts alleged in the Second Amended Complaint do not allow the Court to infer what Plaintiffs are now arguing. Further, the Court is also of the understanding that Plaintiffs' have failed to state a claim under the federal securities laws.

As was advanced by Defendants in their motions to dismiss, the First Circuit has determined that "[t]o prevail under Rule 10b–5 a plaintiff must prove, in connection with the purchase of a security, that the defendant, with scienter, falsely represented or omitted to disclose a material fact upon which the plaintiff justifiably relied." *Willco Kuwait (Trading) S.A.K. v. deSavary*, 843 F.2d 618, 623 (1st Cir.1988) (Citation omitted). *See also Dirks v. S.E.C.*, 463 U.S. 646, 654–656, 103 S.Ct. 3255, 3260–3261, 77 L.Ed.2d 911 (1983). Plaintiffs' Complaint alleges no misrepresentations or omissions of material facts. Plaintiffs' Complaint also fails to allege fraud with sufficient particularity to support Rule 10b–5's deception requirement. Rather, Plaintiffs' Complaint alleges that Defendants openly demanded the issuance of securities to which they were not untitled.

Further, the Supreme Court has reaffirmed the long standing rule that Rule 10b–5 provides a remedy only where there is an actual sale or purchase of securities or a contract to sell or purchase security. *Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 95 S.Ct. 1917, 44 L.Ed.2d 539 (1975), and Plaintiffs' Complaint reveals that Defendants demands for stock were never satisfied. There was

## B. Puerto Rico statute of limitations— PRUSA

Under Section 890(e) of the Puerto Rico Uniform Securities Act ("PRUSA"), a plaintiff must commence suit within "two years after the contract of sale." Thus, assuming that the parties entered into contracts of sale on March 1990, August 1991, and April 1993, Plaintiffs' PRUSA causes of action for the March 1990 and August 1991 transactions are time-barred and, consequently, **DISMISSED WITH PREJUDICE.**

## C. PRUSA liability only upon seller

Plaintiffs' Seventh Cause of Action alleges that Defendants violated section 851 of PRUSA. Defendants argue that section 851 does not provide any remedies for its violation. Instead, the only section of PRUSA which contains any civil remedies is section 890, but section 890 provides remedies only against a person who sells or offers to sell securities by engaging in unlawful conduct. According to Defendants, section 890 provides no liabilities against any person other than the seller of securities. Therefore, according to Defendants, Plaintiffs' Seventh Cause of Action must be dismissed for failure to state a claim.

Plaintiffs do not oppose this ground for dismissal on the basis of Defendants' legal interpretation of PRUSA. Instead, Plaintiffs allege that the April 1992 agreement was a bilateral agreement in which Plaintiffs had to sell stock in exchange for $70,000.00. "The $70,000.00 can be considered securities ('valores') under the act. In ruling on this issue, this allegation must be taken as true." Docket No. 209, at 16.

■ The Court does not have to take as true Plaintiffs' allegation that a payment in cash can be considered as a sale of securities under PRUSA. This is a legal interpretation and, thus, not binding upon the Court. Indeed, the Court rejects Plaintiffs' interpretation. If the Court did

never an event of sale, purchase or issuance of stock between Plaintiffs and Foster Wheel-

not, any transaction involving the transfer of goods in exchange for cash would constitute a securities transaction. This theory is unsupportable under any interpretation of the PRUSA and also unworkable. Accordingly, the Court **DISMISSES WITH PREJUDICE** Plaintiffs' Seventh Cause of Action for failure to state a claim under PRUSA.

## VI.

## CONCLUSION

For the reasons stated in this Opinion, the Court **DENIES IN PART AND GRANTS IN PART** Defendants' motions to dismiss Plaintiffs' Complaint. (Docket Nos. 205 & 206). Specifically, the Court **DENIES** Defendants' motions to dismiss for failure to join an indispensable party; **GRANTS** Defendants' motions to dismiss Plaintiffs' federal securities claims (sixth cause of action) because they are time-barred and Plaintiffs' PRUSA claims because they are time barred and for failure to state a cause of action; the Court **ORDERS** all references to fraud, not to "dolo", to be struck from the pleadings. Only the "dolo" claims that fall short of fraud claims as explained in the Opinion shall survive. The PRUSA claim contained in the seventh cause of action is **DISMISSED.** The Court continues to exercise diversity jurisdiction over Plaintiffs' remaining claims.

**IT IS SO ORDERED.**