**ORIENTAL FINANCIAL GROUP, INC., Plaintiffs**

v.

**FEDERAL INSURANCE COMPANY, INC., Defendants.**

Civil No. 00–2035(JAG).

United States District Court, D. Puerto Rico.

Aug. 1, 2008.

---

José R. González–Irizarry, Leslie Yvette, Flores–Rodríguez, Sonia I. Torres–Pabón, Raúl M. Arias–Marxuach, McConnell Valdés, Ruben T. Nigaglioni, San Juan, PR, for Plaintiff.

Fernando J. Fornaris–Fernández, James W. McCartney, Cancio, Nadal, Rivera & Díaz, San Juan, PR, for Defendants.

## AMENDED OPINION AND ORDER

JAY A. GARCIA–GREGORY, District Judge.

This is a diversity action filed by Oriental Financial Group, Inc. ("Oriental"), a publicly held financial holding company incorporated under the laws of the Commonwealth of Puerto Rico,[1] against Federal Insurance Company ("FIC"), a stock insurance corporation organized under the laws of the state of Indiana, with its principal place of business in the state of New Jersey, based on FIC's denial of coverage under certain financial institution bonds issued to Oriental.[2] Oriental filed with FIC five Proofs of Loss (POL 1–A, POL 2–A, POL 3–A, POL 1–B and POL 3–B) (collectively the "POLs"), claiming $9,589,571 in losses under the fidelity clause of the bonds. Said clause states:

### FIDELITY

1. [The underwriter agrees to indemnify the Insured for] loss resulting solely or directly from one or more dishonest acts by an Employee, whether committed alone or in collusion with others, which acts are committed with intent:

  1. to cause the Insured to sustain such loss, or

  2. to obtain financial benefit for the Employee.

Salaries, commissions, fees, bonuses, promotions, awards, profit sharing, pensions or other similar benefits shall not constitute improper personal financial benefit.

Section (A) of the Insuring Agreements of the Bonds.[3]

On July 12, 2000, FIC issued a letter informing Oriental that its claims under the POLs were denied. Shortly thereafter, Oriental issued a restatement of its financial reports for fiscal years 1998 and

---

1. Mainly through its subsidiary, Oriental Bank and Trust, Oriental provides financial services such as mortgage, commercial and consumer lending, financial managing, money management and investment brokerage services, among others.

2. Bond No. 81522315–A ("Bond A") provided coverage from June 30, 1998 to June 30,

1998; Bond No. 81522315–B ("Bond B") from June 30, 1999 to September 28, 2000, as extended by endorsement.

3. Both bonds contain an identical fidelity clause amended by their respective Riders No. 2.

1999, charging $9.6 million against its net income.

## PROCEDURAL BACKGROUND

As a result of FIC's denial of coverage, on August 11, 2000, Oriental filed a Complaint against FIC. (Docket No. 1). The complaint claimed payment for losses covered by the fidelity bonds underwritten by FIC and damages resulting from breach of contract, bad faith ("dolo") and breach of the covenant of good faith and fair dealing.

The case went to trial and on October 3, 2005, the jury ("first jury") returned a mixed verdict ("2005 verdict"). (Docket No. 244). The jury found in favor of Oriental on the claim under POL 1–A, finding that Oriental had suffered a covered loss of $353,219 as a result of one or more dishonest or fraudulent acts by Oriental employee Miguel Flores relating to the Accounts Receivable/Returned Checks Account ("AR/RC"), and on the claim under POL 2–A, finding that Oriental spent $100,000 in determining its losses related to POL 1–A. The jury also found for Oriental on its claim of bad faith ("dolo"), which is founded on FIC's wrongful refusal to provide coverage. Additionally, the jury granted Oriental consequential damages totaling $7,078,640.60.

However, the jury found for FIC on the claim under POL 1–B, rejecting Oriental's allegation that it suffered a covered loss of $5,605,396.24 resulting from one or more dishonest or fraudulent acts of employees Carlos Ayala and/or Juan Carlos Gonzalez pertaining to the Mortgage Loan Account Portfolio.[4] Finally, the jury could not reach an agreement on Oriental's claim for

$3,442,450 in losses resulting from one or more dishonest or fraudulent acts of employees Miguel Flores, Carlos Ayala and/or Juan Carlos Gonzalez in connection with the reconciliation of a Federal Home Loan Bank account and two Citibank cash accounts.

To determine coverage of Oriental's claimed loss under POL 3–A, the case was partially retried before the undersigned.[5] On August 14, 2007, the jury ("second jury") returned a verdict ("2007 verdict") for defendant and against plaintiff, finding that Oriental did not suffer a covered loss under POL 3–A. Final Judgment was entered on August 15, 2007, stating the following:

> Pursuant to the jury verdict filed on October 3, 2005 (docket #244); judgment is entered:
>
> I. in favor of Oriental Financial Group, Inc. in the amount of $353,219.00 as to Proof of Loss 1–A;
>
> II. in favor of Federal Insurance Company as to Proof of Loss 1–B;
>
> III. in favor of Oriental Financial Group, Inc. in the amount of $100,000.00 for expenses incurred to determine its losses as to Proof of Loss 2–A; and
>
> IV. in favor of Oriental Financial Group, Inc. for concept of damages in the amount of:
>
> A. $900,000.00 for image campaign and public relations expenses,
>
> B. $78,640.60 for legal expenses,
>
> C. $100,000.00 for accounting expenses, and

---

4. Also, the jury did not enter an amount for POL 3–B, which was for $88,505 in expenses incurred to determine the losses related to POL 1–B.

5. This case was originally assigned to Judge Daniel Dominguez, who, after presiding over the first trial, entered an Order of Recusal on

November 1, 2006. (Docket No. 262). The case was reassigned to Judge Gustavo A. Gelpi, who also recused himself (Docket Nos. 263, 266). After shortly returning to Judge Dominguez, the case was reassigned to the undersigned Judge on September 29, 2006. (Docket No. 268).

D. $6,000,000.00 for damage to Oriental Financial Group Inc.'s brand name.

Pursuant to the verdict filed on August 14, 2007 (docket # 341), judgment is entered:

I. in favor of Federal Insurance Company as to Proof of Loss 3–A. (*See* Docket No. 342)

Pending before the Court are FIC's "Renewed Motion for Judgment as a Matter of Law Pursuant to Fed.R.Civ.P. 50(b) or, in the Alternative, for a New Trial Pursuant to Fed.R.Civ.P. 59" (Docket No. 350) and Memorandum in support thereof (Docket No. 358); as well as "Oriental's Motion to Set Aside the 2007 Jury Verdict, for New Trial, and to Alter or Amend Judgment" (Docket No. 351); Oriental's Opposition to FIC's Motion (Docket No. 364); and FIC's reply thereto (Docket No. 368).

### DISCUSSION

### I. Oriental's Motion for New Trial

Oriental's motion for new trial concerns the second trial in this case, that is, the partial retrial held to determine whether Oriental suffered a covered loss under POL 3–A. POL 3–A was for $3,442,450 in losses sustained as a result of deliberate manipulations of the Federal Home Loan Bank ("FHLB") and Citibank N.A. ("Citibank") cash accounts reconciliations by former Oriental employees Miguel Flores, Carlos Ayala and/or Juan Carlos Gonzalez. As defined by Oriental's expert, "[a] reconciliation in the broadest sense is the process that you follow to agree the balance of one account with another account. It might be accounts within the bank or, in the case of a cash account or with a bank, it's the process of determining whether the balance that's reported in the checkbook agrees with the balance reported in the bank statement. And if there are any differences, what accounts for those differ-

ences." *See* Tr. 7/2/07, p. 130, lines 19–25; p. 132, line 1.

During trial, Oriental presented evidence that its employees, in preparing reconciliations, arbitrarily matched credits and debits without verifying their relation. These actions were repeated for several reconciliations and concealed by other employees. Oriental claims that the manipulation of the reconciliations resulted in unresolved transactions amounting to $3.4 million that represent deposits and payments recorded in Oriental's books or reflected in the FHLB and Citibank statements of account activity that Oriental could not identify or trace to any supporting records. As a result, Oriental lost control and track of $3.4 million in assets and was prevented from realizing them. The inability to realize the assets is what Oriental claimed as a loss under POL 3–A. The second jury, however, rejected this claim as a covered loss under the bonds.

Oriental moves (1) to vacate the Final Judgment entered in favor of FIC as to Claim 3–A, (2) for a new trial on Claim 3–A, and (3) for the amendment of the Final Judgment entered on August 15, 2007 so that it reflects prejudgment and post-judgment interest over the award of the first jury.

Rule 59 allows the Court to, on motion, order a new trial after a jury trial, "for any reasons for which a new trial has heretofore been granted in an action at law in federal court...." Fed.R.Civ.P. 59(a); *See also Taber Partners I v. Insurance Co. of North America, Inc.,* 917 F.Supp. 112, 116 (D.P.R.1996). The motion for a new trial may invoke the discretion of the court in so far as it is bottomed on the claim that the verdict is against the weight of the evidence, that the damages are excessive, or that, for other reasons, the trial was not fair to the party moving; and may raise questions of law arising out of the alleged

substantial errors in admission or rejection of evidence or instructions to the jury. *Montgomery Ward & Co. v. Duncan*, 311 U.S. 243, 251, 61 S.Ct. 189, 85 L.Ed. 147 (1940). The Court may grant a new trial although it has denied the entry of judgment as a matter of law under Fed. R.Civ.P. 50, *China Resource Products (U.S.A.) Ltd. v. Fayda Intern., Inc.*, 856 F.Supp. 856, 862 (D.Del.1994), or even when substantial evidence supports the jury's verdict, *Lama v. Borras*, 16 F.3d 473, 477 (1st Cir.1994). "But this does not mean that the district court should grant a motion for new trial simply because the court would have come to [a] different conclusion." 11 James Wm. Moore, Moore's Federal Practice 3D, 12 § 59.13[2][a] at 59–44 (2003). Instead, a new trial "should only be granted where a 'miscarriage of justice would result if the verdict were to stand,' the verdict 'cries out to be overturned,' or where the verdict 'shocks our conscience.'" *Smith v. Delaware Bay Launch Service, Inc.*, 842 F.Supp. 770, 778 (D.Del.1994) (*quoting Cudone v. Gehret*, 828 F.Supp. 267, 269 (D.Del.1993)).

### A. The "Erroneous" Rulings

Oriental argues that the 2007 verdict constitutes a clear legal error because it is premised on several erroneous rulings. According to Oriental, these erroneous rulings are: (1) denying Oriental's request for a specific jury instruction that FIC acted maliciously (with "dolo") when it knowingly defaulted on its contractual obligations under the bonds, as found by the first jury; (2) denying Oriental the opportunity to present to the jury evidence of FIC's malicious and bad faith breach; and (3) allowing FIC to introduce evidence of Oriental's alleged negligence while at the same time denying Oriental's request for a limiting instruction. According to Oriental, these errors allowed FIC to mislead the second jury by presenting itself as an innocent insurer who acted in good faith in investigating Oriental's claims.

### 1. Specific jury instruction regarding bad faith ("dolo")

### 2. Evidence of bad faith ("dolo")

FIC first responds to Oriental's claim that the Court erred in barring evidence of bad faith, stating that it is a belated motion for reconsideration and that none of the prerequisites for a motion for reconsideration (the availability of new evidence not previously available, an intervening change in controlling law or the need to correct a clear error of law or to prevent manifest injustice) are present in this case. On this point, Oriental argues that the prerequisites are clearly met and that Rule 59(e) is the appropriate procedural device to challenge the legal correctness of these decisions by the Court immediately following the entry of judgment.

■ Pursuant to Fed.R.Civ.P. 59(e), a party may ask the Court "to amend its judgment based on newly discovered material evidence or because the Court committed a manifest error of law or fact." *Colon v. Fraticelli*, 181 F.Supp.2d 48, 50 (D.P.R. 2002) (*citing Aybar v. Crispin–Reyes*, 118 F.3d 10, 16 (1st Cir.1997)). "Rule 59(e) motions are aimed at *re consideration*, not initial consideration." *Jorge Rivera Surillo & Co., Inc. v. Falconer Glass Indus., Inc.*, 37 F.3d 25, 29 (1st Cir.1994) (*citing F.D.I.C. v. World Univ. Inc.*, 978 F.2d 10, 16 (1st Cir.1992)). Thus, Rule 59(e) is not a proper mechanism to advance arguments that should have been presented before judgment was entered, but were not. *Id.* Oriental has brought the issue of the "erroneous" rulings before the Court previously and now claims that a clear error of law must be corrected to prevent manifest injustice. Accordingly, the Court will briefly discuss the arguments advanced by

Oriental in contesting the rulings regarding the partial retrial.

■ Oriental first challenges the Court's ruling regarding the presentation of evidence of bad faith ("dolo"). Oriental's position is that the presentation of bad faith evidence would have overwhelmingly contradicted FIC's portrayal of itself as a diligent insurer. FIC, however, states that this Court correctly held that evidence of bad faith in the partial retrial would be irrelevant because the issue of bad faith had already been decided by the first jury and that allowing the presentation of such evidence would be highly prejudicial to FIC.

In its Opinion and Order of April 2, 2007 483 F.Supp.2d 161 (D.P.R.2007), the Court discussed the issues that were to be determined at the partial retrial of this case and held that the first jury's finding of bad faith ("dolo") precluded Oriental from presenting any evidence of bad faith ("dolo") at the retrial. The Court's reasoning, in essence, was that Oriental's bad faith ("dolo") claim "is not linked to any specific bond-related claim but is instead a separate cause of action that has to do with FIC's general refusal to provide coverage."[6] (483 F.Supp.2d at 165). This conclusion was supported by the pleadings, the instructions given to the first jury and the structure of the jury verdict form. In sum, the Court determined that because the finding of bad faith ("dolo") by the first jury was cumulative for all the claims, it had no bearing on the determination of whether Oriental suffered a covered loss as claimed under POL 3–A and any evidence of bad faith or reference to the first jury's finding on that issue should be excluded from the partial retrial.

Once again being called into question, the Court stands by its ruling. Whether the claims were wrongfully denied or not is a determination separate from that of whether there was bad faith in denying coverage. The only issue left to be determined after the first jury rendered its verdict was whether POL 3–A was wrongfully denied. As such, allowing evidence of bad faith ("dolo") or giving an instruction regarding the first jury's finding of bad faith would have unfairly prejudiced FIC in the partial retrial since the bad faith previously found is irrelevant in the determination of coverage under POL 3–A. No manifest error of law or fact was committed.

### 3. Evidence of Oriental's negligence and limiting instruction

Oriental also argues that the Court erred in allowing FIC to introduce evidence of Oriental's negligence while at the same time denying Oriental's request for a limiting instruction. FIC's so-called defense consisted in presenting evidence of Oriental's negligence in not following its document retention policy and its carelessness in not being able to locate documents

---

6. Oriental challenges this Court's language in stating that the "dolo" claim is a separate cause of action. The Court clarifies it is aware that under Puerto Rico law, there is no specific statute providing a cause of action for bad faith refusal to settle a claim. A person aggrieved by an insurer's refusal of coverage under an insurance contract may file an action under the Civil Code's provisions concerning contract law to compel specific performance and recover foreseeable damages; if bad faith is alleged, then he may recover actual damages that resulted from the breach, and not just those foreseeable. P.R. Laws Ann. Tit. 31 § 3024. As such, although the "dolo" claim is not a separate "cause of action," it is contingent upon the breach of contract claim (in this case, wrongful refusal of coverage) and can therefore be separated for purposes of retrial from the specific issue of whether there was a breach. In similar circumstances, courts have referred to "dolo" as a separate cause of action contemplating the same meaning as the Court intended here. *See Event Producers, Inc. v. Tyser & Co.*, 854 F.Supp. 35, 38 (D.P.R.1993).

that would have allowed it to investigate all the transactions that were tampered with by employees. Oriental's position is that this is a defense that goes to liability and is therefore contrary to law. On this point, Oriental cites a holding by Judge Dominguez, the presiding judge in the first trial, who stated that negligence, because it is not an affirmative defense under claims to recover from fidelity bonds, would not be admitted for the purpose of establishing comparative negligence but only for the limited purpose of establishing the extent of the loss recoverable under the terms of the bonds. Oriental regards this holding as the law of the case and contends it was violated by this Court's holding that FIC's evidence was admissible because it had to do with causation and not liability. Moreover, Oriental believes that a single instruction at the end of the second trial was not enough to correct or clarify to the jury that it was not a legally viable defense. Oriental sustains that a single instruction "embedded within" thirty other instructions could not cure "the effect of testimony that clearly sought to exculpate FIC in contravention to the applicable law."

█ While the issue regarding the admission of negligence evidence will be discussed separately, the issue of the limiting instruction is one of easier disposition. The Court gave the instruction Oriental requested [7] and used its discretion in not giving it during the witness' testimony.

The fact that said instruction was given at the close of the evidence, along with all the other instructions, does not bolster Oriental's argument. Regardless of the quantity of instructions given to a jury, "[w]e presume that juries follow instructions." *U.S. v. Gonzalez–Vazquez*, 219 F.3d 37, 48 (1st Cir.2000). However, this presumption may be rebutted upon sufficient showing that the jury reasonably could not have followed the instruction and that serious prejudice likely resulted. *See Id.*; *Ramos v. Davis & Geck, Inc.*, 224 F.3d 30 (1st Cir.2000). In this case, the sole fact that the limiting instruction was given in conjunction with the rest of the instructions does not give the Court sufficient reason to believe that the jury could not have reasonably followed it. Accordingly, the presumption that the jury did follow the instruction has not been rebutted. No manifest error was committed in giving the instruction as the Court did.

### B. The 2007 Verdict

Next, Oriental attacks the jury's finding for FIC on POL 3–A, arguing that the 2007 verdict constitutes a manifest miscarriage of justice inasmuch as it is against the clear weight of the evidence. According to Oriental, no rational jury could have found that Oriental did not prove the elements necessary to prevail under the bond.

█ Because of how the jury verdict form was structured, the second jury's de-

---

7. Jury Instruction No. 21 stated:

Negligence, if any, by Oriental, does not constitute a defense for FIC in the absence of a contract limitation expressed in plain and unambiguous terms. FIC's bond does not contain any provision concerning release of liability for negligence.

Accordingly, if you find that Oriental proved all of the elements of its cause of action and is therefore entitled to recover under FIC's bond, then negligence, if any, resulting from the existence of inadequate policies and procedures at Oriental, or the failure to follow policies and procedures then in place at Oriental, is not a defense available to FIC. FIC is not released from liability, even by the absence on the part of Oriental of ordinary prudence to lessen the risk, if all the elements of the cause of action are proven.

However, negligence, if any, by Oriental, is a defense available to FIC only if you find that said negligence amounted to fraud or bad faith on the part of Oriental.

(*See* Docket No. 339).

termination in favor of FIC as to POL 3–A is not specific as to each element that needs to be proven under the bond.[8] It is unknown which element the jury found Oriental failed to prove or if it determined that none of them were proven. Therefore, the Court will examine each element separately to ascertain whether a determination in the negative as to each would be sustained by the evidence presented to the jury, or if on the contrary, it would be unjust to let the verdict stand. To summarize, Oriental had to prove that (1) it suffered a loss (2) resulting solely or directly from one or more dishonest acts by an employee, whether committed alone or in collusion with others, (3) which acts are committed with intent to cause Oriental to sustain such loss, or to obtain financial benefit for the Employee.

### 1. Loss

First, Oriental states that it clearly proved that it suffered a loss under POL 3–A. Oriental points to evidence presented at the second trial that alterations were made to reconciliations in several accounts; that those manipulations deprived Oriental of the possibility of conducting a timely investigation; that the lack of documentation to reconcile the outstanding reconciling items resulted in unresolved transactions; and that the unresolved transactions represented a loss of cash amounting to $3.4 million. Moreover, Oriental states that FIC never denied that Oriental suffered a loss of $3.4 million.

FIC, on the other hand, sustains that there was evidence that Oriental did not suffer a loss recoverable under the bonds.

Specifically, FIC points to the testimony of its expert, Luis Carranza, who testified that POL 3–A was a result of Oriental's problems with its accounting transactions and that the claim did not represent an actual defalcation or extraction of funds by certain individuals. According to FIC, the jury was free to credit Carranza's testimony on the loss issue and find that the $3.4 million write-off was not a loss.

Oriental, however, argues that Carranza's statements were about the cause of the loss and that therefore, they do not establish a lack of loss, but only that he believed there was no evidence that the individuals involved extracted the funds, a fact Oriental sustains it did not have to prove in order to establish a loss under the bond. According to Oriental, it only had to prove that it suffered a decrease in assets or an increase in liabilities or a failure to keep what it had. It states that the testimony of Rafael Martinez Margarida (one of Oriental's expert witnesses) and Rafael Valladares (Oriental's former Senior Vice President and Principal Financial Officer), as well as the stipulations of the 2000 restatements established the loss and constitute uncontroverted evidence.

Throughout the second trial, the Court struggled with the concept of loss as claimed by Oriental under POL 3–A, especially in view of the fact that the bonds did not define the term "loss." Was the loss claimed under POL 3–A the kind of loss the bond was meant to cover? While Oriental argues for the traditional definition of loss as a decrease in assets or increase in liabilities, or failure to keep what one

---

**8.** The question posed to the jury in the Verdict Form was: "For Proof of Loss 3–A ($3,442,-450 claimed by Oriental in connection with the Federal Home Loans Bank and Citibank Cash Accounts Reconciliations), based on direct or circumstantial evidence or reasonable inferences therefrom: Do you find that Oriental suffered a loss resulting solely or directly from one or more dishonest or fraudulent acts of Miguel Flores and/or Carlos Ayala and/or Juan Carlos Gonzalez, committed with the intent to either personally benefit themselves or a third person financially, or to cause the bank to suffer the loss?" (*See* Docket No. 341).

has, this definition needs to be put in the context of a fidelity bond. As defined by commentators, "[l]oss under a fidelity policy or bond refers to actual loss, as distinguished from a theoretical or bookkeeping loss, although the bond may provide otherwise." Couch on Insurance 3d, § 160:61. The parties agree on this, and an instruction was given to this effect:

In order to establish the element of a loss, Oriental must show that it suffered a decrease in assets or an increase in liabilities, or failure to keep what one has. Cash is an asset.

Loss under a fidelity bond refers to actual loss, as distinguished from a theoretical or bookkeeping loss. A recoverable loss is a direct loss, or the actual depletion of bank funds, i.e. cash, caused by the employee's dishonest acts. Bookkeeping or theoretical losses, not accompanied by actual withdrawals of cash or other such pecuniary loss, are not recoverable losses.

In proving the loss, Oriental may rely on circumstantial evidence. This means that Oriental does not need to prove its loss with mathematical precision or certainty, or to identify the specific items that make up the loss.

(See Docket No. 339, Instruction No. 16).

The claimed amount under POL 3–A represents the accounting imbalance in Oriental's cash accounts with the FHLB and Citibank. This imbalance is composed of transactions that could not be reconciliated for lack of supporting documentation. It is important to keep in mind that the purpose of performing reconciliations on these accounts, as stated by Oriental's own expert witness, is to confirm that the balances reported on Oriental's accounts with FHLB and Citibank are correct by verifying that no errors have been made in any of the transactions. See Tr. 7/2/07, p. 132, lines 4–8. If there is an error, then it is reported and corrected. Specifically, when

an error is made against Oriental, a timely claim must be filed "in order to recover money." See Tr. 7/2/07, p. 132, lines 4–14.

Oriental's theory of loss under POL 3–A was that it was unable to realize its assets because it could not obtain the supporting documentation to properly reconcile the accounts. In contrast with the theory advanced by Oriental as to POL 1–A, in POL 3–A, the bank did not propose that it lost cash as a result of embezzlement by employees who were manipulating accounting transactions to conceal their actions. What Oriental claimed in POL 3–A was that the accounting manipulations themselves resulted in a loss to the bank. The question is then posed: Was Oriental's claimed loss under POL 3–A an "actual loss" or was it a "theoretical or bookkeping loss"?

Oriental's theory could have proven that it suffered an actual loss if sufficient evidence was presented that the transactions that made up the unreconciled amount of $3.4 million were all errors made by the banks against Oriental. In that case, the supporting documentation would serve as the basis for Oriental's claims to the banks, which would then rectify the mistake and credit Oriental's accounts. If, on the other hand, the transactions are correct, then the supporting documentation would not serve to rectify any mistake that would result in a credit to Oriental's accounts; it would only serve to confirm that the transactions are correct and the balance in the accounts is proper. The issue then is whether the evidence presented by Oriental proves that more likely than not, it would have realized assets upon complete reconciliation of the pending transactions.

Herein lies a problem. The evidence shows that Oriental could not identify the transactions that made up the unreconciled amount. Because their nature and/or va-

lidity is unknown, it is entirely possible that those transactions were not erroneous and that the balances on the FHLB and Citibank accounts were properly reflected. In such a case, Oriental would not have suffered an actual loss because the money would be where it is supposed to be.

■ Moreover, while Oriental presented evidence to prove that it suffered a loss— evidenced by a write-off—, FIC presented evidence that Oriental did not suffer an extraction of funds. Specifically, Carranza testified that the loss claimed under POL 3–A was an accumulation of unresolved balances that did not represent an actual defalcation or extraction of funds by Oriental employees. *See* Tr. 8/13/07, pp. 36–37.[9] Under a fidelity bond, bookkeeping or theoretical losses that are not accompanied by actual withdrawals of cash or other such pecuniary loss, are not recoverable. *F.D.I.C. v. United Pacific Ins. Co.*, 20 F.3d 1070 (10th Cir.1994). "Language in a fidelity bond to the effect that the insured is covered for 'losses directly resulting from . . .' indicates a direct loss or the actual depletion of bank funds caused by the employee's dishonest acts." *Id. citing First American State Bank v. Continental Ins. Co.*, 897 F.2d 319, 325 (8th Cir.1990); *American Trust & Sav. Bank v. United States Fidelity & Guaranty Co.*, 418 N.W.2d 853, 855 (Iowa 1988). Therefore, false or negligent accounting entries can only result in a loss under a fidelity bond if, as a result of them, money leaves the bank.

Having heard evidence of the type of loss suffered by Oriental and of the policy terms, the jury determined that the loss claimed in POL 3–A was not a covered loss under the bonds issued by FIC. As to the existence of the loss, the jury was free to credit Carranza's testimony and find that the loss suffered by Oriental was not the kind of loss the fidelity bond was meant to cover. Moreover, the Court finds that crediting Mr. Carranza's testimony over the rest of the evidence presented by Oriental to prove that it suffered an actual loss was reasonable. Oriental did not prove by a preponderance of the evidence that money left the bank or that it could not realize assets it otherwise would have. Although Oriental is correct in stating that it did not need to prove that the individuals involved extracted the funds to prove the loss element of coverage, it did have to prove that there were withdrawals of cash or other such pecuniary loss. It failed to do so. Even if there was a write-off, the evidence shows that more likely than not, the write-off was an accounting adjustment not based on an actual loss. If the jury determined that there was no loss, the Court would agree. The evidence does not sustain a finding of actual loss under the bond.

As such, the Court holds that a determination that Oriental did not suffer a loss under the fidelity bonds as claimed in POL 3–A would not be a seriously erroneous result but instead, would be in accordance with the evidence presented. No miscarriage of justice would result from such a finding.

## 2. Causation and the "Defense"

In order to recover under the bond, Oriental had the burden of proving that the loss resulted "solely or directly from one or more dishonest acts by an Employee, whether committed alone or in collusion with others." Oriental argues that it clearly proved that the loss resulted directly from the dishonest and fraudulent

---

**9.** The fact that Carranza simultaneously testified as to the cause of the loss, blaming Oriental's accounting practices, does not discredit his testimony in view of the fact that the cause of the loss is an issue separate yet closely intertwined with the issue of the existence of a loss.

alterations and manipulations of the reconciliations; that is, that it established causation. Oriental's version is that the fraudulent and/or dishonest acts of its employees directly caused the loss of $3,442,450 because the employees set in place a chain of events which resulted in the bank losing the opportunity to timely locate the documentation that would have allowed it to completely mitigate its losses. According to Oriental, the evidence presented at the trial showed that the necessary documentation was available when Samuel Vega (Oriental's former Accounting Department Clerk) was reconciling the accounts in question, but that he was replaced with Carlos Ayala, who had no incentive to reconcile the accounts because he was "in on" the fraudulent scheme. Moreover, Oriental points to the testimonies of Valladares and Martinez Margarida, which according to Oriental, showed that its loss was the direct result of the manipulations to the reconciliations because they precluded the bank from conducting a timely investigation of the outstanding items. Additionally, Oriental states that the testimonies of Vega and Ramon Ponte (Partner of PricewaterhouseCoopers in charge of Oriental's external audit process) showed that the items which comprised the loss in this case could have been investigated and reconciled had the reconciliations not been altered. Oriental argues that the two years of active concealment of the initial fraudulent and/or dishonest acts prevented Oriental from discovering it and also from making timely inquiries to the third parties that could have provided it with the necessary documentation. Specifically, there is evidence on the record that the FHLB and NYACH (New York Automatic Clearing House) [10] did not keep records for more than six months, while Oriental was prevented from investigating the reconciling items for two years.

Regarding the element of causation, FIC argues that there was sufficient evidence to prove that the loss (if there was a loss) did not result solely or directly from one or more dishonest or fraudulent acts by an employee, as required under the bonds. FIC states that it was reasonable for the jury to determine that the sole and direct cause of the bank's loss was its failure to follow its own policies and regulations in maintaining documents and not the dishonest or fraudulent acts of employees based on the following: (1) the fact that POL 3-A states and the witnesses admitted that the unavailability of the supporting documents was the primary reason for the inability of the bank to reconcile and identify the $3.4 million difference; (2) Martinez Margarida's testimony that there was no evidence that Flores, Gonzalez or Ayala did anything to the supporting documentation; (3) the fact that the bank was able to completely reconstruct the reconciliation altered by Flores; and (4) the testimonies of Ponte, Roberto Fernandez (Oriental's former Comptroller), Gonzalez and Martinez Margarida to the effect that the bank and the local and federal governments had policies and/or statutes or regulations which required the bank to maintain documents for somewhere between five and fifteen years. Moreover, the fact that Oriental refers to the loss as the result of a "chain of events" that began with the employees' actions, according to FIC, evidences that causation is lacking in this case because unless the entire chain of events was made up of dishonest acts by the bank employees, the jury was free to conclude that their acts were not the sole or direct cause of Oriental's loss.

---

10. The electronic transactions processed at Oriental were done through the FHLB, which in turn would process them with the clearinghouse NYACH. *See* Tr. 6/26/07, p. 73, line 23–25, p. 74, lines 1–4; Tr. 7/2/07, p. 131, lines 9–13.

Oriental replies by stating that the failure to maintain documents does not go to causation but to liability, a defense that is contrary to law, and that the second jury could only find for FIC if Oriental had acted fraudulently or in bad faith. According to Oriental, even if its negligence in not maintaining documents contributed to the loss, the weight of the evidence was that the loss resulted directly from the dishonest acts. Since it had to prove that the loss resulted solely or directly from one or more dishonest and/or fraudulent acts committed by an employee, Oriental claims to have proven its case.

Contrary to what Oriental argues, FIC states that it did not use the bank's negligence as a defense to coverage in this case. According to FIC, an improper negligence defense to the fidelity bond claim would have been alleging that Oriental should have stopped Flores from altering the reconciliations or that the bank should have discovered the altered reconciliations earlier. FIC states that it did not argue this but instead that the alleged dishonest acts were not the sole or direct cause of the claimed loss because the loss was caused by the failure to locate supporting documentation that by Oriental's own policy, it should have maintained. FIC's position is that the documentation issue had nothing to do with the alleged dishonest acts of the employees.

### (a) *Admissibility of the Defense*

■ We first address the admissibility of the evidence of Oriental's negligence in keeping the documentation needed to properly reconcile the FHLB and Citibank accounts. Both parties agree that the negligence of the insured does not release the insurer from liability absent a clear and specific contractual limitation or circumstances that amount to fraud or bad faith on the part of the insured. *See Ar-*

*lington Trust Company, Inc. v. Hawkeye–Security Insurance Co.,* 301 F.Supp. 854, 858 (E.D.Va.1969); *Midland Bank v. F & D Company of Maryland,* 442 F.Supp. 960, 972–73 (D.N.J.1977). The jury was instructed accordingly.[11] Since there are no specific contractual limitations regarding the negligence of Oriental that would release FIC from liability and there was no evidence of any circumstance that would amount to fraud or bad faith on the part of the bank, a defense of negligence does not liberate FIC from liability. However, as the Court held during the second trial of this case, the evidence presented regarding the document retention policies of Oriental and its accounting practices does not go to liability; it goes to causation. Oriental continues to contest this holding of the Court. The Court however, stands by its ruling.

To prove the element of causation, Oriental had to prove that the employees' indiscriminate elimination of transactions and subsequent concealment thereof, was the sole or direct cause of the bank's loss (assuming there was a loss). Oriental sought to prove this through a series of steps: (1) the employees' actions impeded the bank from being able to gather the supporting documentation needed to reconcile the accounts; (2) the failure to identify the supporting documentation caused Oriental to lose track of its assets (be unable to reconcile); (3) the outstanding reconciling items could not be realized as assets and therefore, the bank suffered a loss. It is clear from the above that Oriental could not prove that the employees' actions were the direct or sole cause of the loss without first proving that said actions were the direct or sole cause of the failure to locate the documents.

---

**11.** See *supra* note 6.

■ As with any element required of Oriental to prove under the bond, FIC is entitled to call into question Oriental's theory of causation as well as to present any alternative theory of its own. Accordingly, FIC focused on presenting evidence to prove that the employees' actions were not the reason—or at least the only reason— Oriental could not gather the supporting documentation required for the reconciliations. FIC presented evidence that none of the employees involved with the elimination of transactions did anything to the supporting documentation and that the documentation was probably lost as a result of Oriental's poor document retention policies. This evidence clearly goes to causation: it answers why the documents were lost, not how could the employees' actions have been checked or avoided. The latter would be an improper defense that goes to liability, the former, proper evidence of causation. *See Midland Bank*, 442 F.Supp. at 972–73; *Arlington Trust Co.*, 301 F.Supp. at 858; *Home Sav. and Loan v. Aetna Cas. and Sur. Co.*, 817 P.2d 341, 362–63 (Utah App.1991). Because the evidence of Oriental's negligence goes to causation, it was correctly admitted during trial.

The Court notes that this holding does not go against the law of the case, as argued by Oriental. During the first trial of this case, Judge Dominguez stated that evidence of "negligence or carelessness *in supervising* its employees and examining the bank's accounts and/or establishing or implementing controls or procedures *to prevent* employee thefts or fraudulent behavior and omissions" would not be admitted for the purpose of establishing comparative negligence but only for the limited purpose of establishing the extent of the loss recoverable under the terms of the bonds.[12] (emphasis ours). This holding was not directed at excluding any specific evidence, but was meant as a general exclusion of evidence of the bank's negligence in taking measures to prevent employee thefts or fraudulent behavior.[13] As such, the excluded evidence went to liability. In contrast, the evidence Oriental sought to exclude in the second trial had to do with what caused the loss claimed in this case, not what could have been done to avoid it. Accordingly, the previous holding by Judge Dominguez is consistent with ours.

(b) *Jury's Determination Regarding Causation*

While the jury was presented with evidence of how the employees' actions, through a chain of events, caused the bank to be unable to locate the supporting documents for the unreconciled transactions, it was also presented with evidence of how the employees did not destroy or otherwise do anything directly to the supporting documentation. *See* Tr. 7/3/07, p. 71. These two pieces of evidence do not offset each other because they are not probative of the same exact fact. While FIC's evidence that the employees did not throw out the

---

**12.** Ruling upon a Motion in Limine, Judge Dominguez stated: "The Court is aware that negligence by the insured is not an affirmative defense under claims to recover from fidelity bonds. *Fidelity & Deposit Co. of Maryland v. Courtney*, 186 U.S. 342, 22 S.Ct. 833, 46 L.Ed. 1193 (1902); 11 Couch on Insurance 3D (1998), §§ 162.11 and 162.12. Further, negligence evidence shall not be admitted for the purpose of establishing comparative negligence. Nevertheless, relevant negligence evidence shall be admitted at trial pursuant to Fed. Rules Evid. Rules 105, 401 and 402, 28 U.S.C.A. for the limited scope of establishing the extent of the loss recoverable under the terms of the bonds. In other words, the Court shall admit evidence towards damages but not as to liability." (*See* Docket No. 120.)

**13.** Furthermore, Oriental does not point to any instances in which the specific evidence sought to be excluded in the second case was excluded in the first.

documents is uncontroverted evidence of the fact that there was no direct causation here, Oriental's evidence fails to prove that the employees' actions were the sole cause of its failure to locate the documents.

The issue is whether Oriental lost the documents because it was negligent or because of the employees' actions, or both. There was no evidence that the documents would have been available had the employees not altered the reconciliations.[14] Moreover, the weight of the evidence is that Oriental's own practices caused the documents to be lost. Even if the employees' actions contributed to Oriental's failure to locate the necessary documents, they were not the only reason for it. Based on the evidence presented, the jury could have reasonably determined not only that the employees' actions did not directly cause the bank's failure to locate the documents necessary to reconcile the accounts, but also that the employees' actions were not the sole cause of that failure to locate the documents.

Therefore, sufficient evidence was presented for a rational jury to find that the employees' actions were not the sole or direct cause of the loss suffered by the bank. Accordingly, the Court understands that a determination that the employees' actions were neither the sole nor the direct cause of Oriental's loss as claimed in POL 3–A would be based upon sufficiently reasonable evidence so that it would not be a seriously erroneous result. No miscarriage of justice would result from such a finding.

### 3. Intent

The last element that Oriental had to prove to recover under the bonds was intent: that the employees acted with intent to cause the bank to sustain such loss, or to obtain financial benefit for themselves. Oriental sustains that it clearly proved that the alterations and manipulations of the reconciliations were dishonest and fraudulent acts committed with the intent to cause Oriental to suffer a loss. According to Oriental, the acts were dishonest and fraudulent because they did not comport with obligations that all accounting employees had under accepted accounting principles and Oriental's Code of Ethics. Moreover, Oriental argues that the acts were intentional because the employees knew that a possible consequence of the improper reconciliations was a loss to the bank. Oriental sustains that the testimonies of Valladares, Martinez Margarida and Vega proved that the acts were dishonest and fraudulent and that the employees' own admissions prove that the acts were intentional. Therefore, Oriental sustains that a rational jury would draw both conclusions.

FIC argues that even if the employees' actions were dishonest, a jury could have found that they were not intended to cause the bank to suffer a loss but were instead directed at rectifying a bad situation in the reconciliations. According to FIC, the evidence presented could only possibly prove that the employees' acts were intentional and that they knew that such acts might cause a loss. Finally, FIC states that the element of intent is one most suitably left for a jury to determine and the Court should not impose its judgment over the jury's.

It is precisely what FIC states—that the employees' acts were intentional and that they knew that such acts might cause a loss—what Oriental argues proves the intent element under the bond. Oriental

---

**14.** Although Oriental argues that uncontroverted testimony at trial shows this, the Court has reviewed the portions of the transcript cited by Oriental and fails to find any such evidence or any evidence that could lead a rational fact finder to make an inference to that effect as to the transactions that made up POL 3–A.

sustains that the employees intended to cause a loss to the bank because acting with the knowledge of the natural and probable consequences of a conduct is considered acting with intent to cause said consequences. Moreover, Oriental refutes FIC's alternative theory of intent, stating that there was no evidence to prove FIC's allegation that the employees' acts were directed at rectifying a bad situation at the bank and that it is reasonable to infer the opposite since neither Flores nor Ayala said that the reconciliations were altered to assist Oriental.

Indeed, a person acts with intent to cause a particular result if he desires to cause the consequence of his acts or knows that the result is the natural and probable consequence of his actions. *FDIC v. United Pacific Ins. Co.*, 20 F.3d 1070, 1078 (10th Cir.1994). Therefore, even if a person does not desire to cause the consequences of his actions, if he knows that his actions will naturally or probably cause said consequences, then he is deemed to have acted with intent to cause them. In this case, Oriental had to prove that the employees acted with the intent to cause Oriental to suffer a loss. As such, evidence that they knew that a loss would probably result from their actions is sufficient to prove intent.

FIC admits that Oriental's evidence may have shown that the employees knew that their acts would probably cause a loss as claimed in POL 3-A. Oriental presented evidence that Flores knew that his actions would eliminate any trace that may have allowed identification of the source and origin of reconciling items; that Ayala knew that the inability to reconcile causes a loss to the bank; that Gonzalez recognized that an improper reconciliation can lead to a loss. However, the determination of intent in this case is closely linked to the existence of a loss under the bond. Having determined that it would be ration-al for the jury to find that there was no loss under the bond as claimed in POL 3-A, it would also be rational to conclude that the requisite intent to cause a loss was absent.

#### 4. Credibility of Witnesses

Oriental next argues that its witnesses should be afforded more credibility than FIC's witnesses, Gonzalez and Carranza. Oriental argues that while Gonzalez's credibility can be questioned because he was one of the perpetrators of the fraudulent and dishonest acts, was terminated from his employment with Oriental and was impeached with prior testimony, Carranza's credibility can be questioned because he is not a Certified Fraud Examiner, he has never performed a financial audit, was evasive when questioned and has a lot to gain in exchange from his testimony in this case given his relationship with FIC. Oriental's witnesses, on the other hand, do not work for the bank anymore and have nothing to gain from testifying. The only rational conclusion then, according to Oriental, is that the jury abdicated its function and rendered a verdict that goes against the weight of the evidence, more so in view of the fact that there was a month long interruption between Oriental's case in chief and FIC's evidence and the fact that the jury took only two hours to deliberate in a document intensive case. FIC replies by stating that assessing the credibility of witnesses is inherently a jury function. However, it cites the testimony of Valladares to argue that, contrary to FIC's witnesses, he admitted to lying in the past.

In this case, the Court has already determined that it was rational for the jury to reach its verdict as to POL 3-A and that said verdict was in accordance with the weight of the evidence. The credibility of the witnesses was an element assessed by the jury in rendering its verdict and the Court deems it proper for the jury to have

afforded the credibility it did to the witnesses presented in order to reach its verdict. Moreover, the arguments advanced by Oriental on this issue are unconvincing and insufficient for the Court to order a new trial as to POL 3–A.

### C. Pre–Judgment and Post–Judgment Interest

Finally, Oriental argues that it is entitled to mandatory prejudgment and post-judgment interest over the jury award and that the Judgment should be amended to reflect said interest. However, the Court will address the arguments regarding prejudgment and post-judgment interest after it has disposed of all substantive issues.

## II. FIC's Motion for Judgment as a Matter of Law or for New Trial

In its Memorandum, FIC moves the Court (1) to grant it judgment as a matter of law, or in the alternative, to grant it new trial on the issue of bad faith ("dolo"), (2) to enter judgment in its favor as to Proof of Loss 1–A, (3) to deny Oriental's motion for a new trial, and (4) to grant prejudgment and postjudgment interest. Having already discussed at length the third of these petitions, the Court will only address the remaining three.

Rule 50 allows a party during a jury trial to move the Court for entry of judgment as a matter of law. Such a motion may be granted "[i]f a party has been fully heard on an issue during a jury trial and the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue...." Fed.R.Civ.P. 50(a)(1). If the Court denies the motion, then "[n]o later than 10 days after the entry of judgment [... t]he movant may file a renewed motion for judgment as a matter of law and may include an alternative or joint request for a new trial under Rule 59." Fed. R.Civ.P. 50(b). "[T]he party renewing a motion for judgment as a matter of law

pursuant to Rule 50(b) 'is required to have moved for judgment as a matter of law at the close of all the evidence.'" *Taber Partners I v. Insurance Co. of North America, Inc.*, 917 F.Supp. 112, 115 (D.P.R.1996) (*quoting Keisling v. SER–Jobs for Progress, Inc.*, 19 F.3d 755, 758 (1st Cir.1994)).

"A motion for judgment as a matter of law, like a motion for summary judgment, questions whether a reasonable jury could reach only one result based upon the evidence." *Id.* (*citing Anderson v. Liberty Lobby, Inc.*, 477 U.S. at 251, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)). As part of this analysis, courts "may not consider the credibility of witnesses, resolve conflicts in testimony, or evaluate the weight of the evidence." Moore, *supra* 9 § 50.06[6][b], at 50–40. Pursuant to Fed.R.Civ.P. 50, FIC's "motion for judgment cannot be granted unless, as matter of law, [plaintiff] failed to make a case ..." *Montgomery Ward & Co. v. Duncan*, 311 U.S. 243, 251, 61 S.Ct. 189, 85 L.Ed. 147 (1940).

### A. POL 1–A

█ FIC argues that there was insufficient evidence to support the first jury's finding that Oriental could recover $353,000 on POL 1–A. As stated above, POL 1–A claims that Oriental suffered a loss amounting to $353,219 as a result of dishonest or fraudulent acts of former employee Miguel Flores in relation to the Accounts Receivable/Returned Checks ("AR/RC") Account. Oriental's theory was that, as a result of an investigation that uncovered an embezzlement scheme perpetrated and admitted by Flores whereas he appropriated $377,696.65, Oriental discovered another scheme which allowed the embezzlement of funds through the AR/RC subsidiary ledger that was his responsibility. The second scheme is what is claimed in POL 1–A to have caused a loss

of $353,219, Flores having reimbursed Oriental for the $377,000 previously embezzled.

The $353,219 claim in POL 1–A was made up of two amounts. The first, $239,421, was the balance of returned checks that were sent to the originating department for collection, and which Flores should have removed but kept in the subsidiary ledger. Oriental alleged to have suffered a loss as a result of this because a significant number of checks—which are assets of the bank—had to be deleted from the subsidiary list. The second amount that makes up the claim asserted in POL 1–A, $166,750, was the balance of returned checks which were not removed from the AR/RC general ledger and could not be located, even though they had been outstanding for a long time and should have therefore been in Oriental's possession. Because Oriental's assets reflected in the general ledger balance had to be reduced, a loss was recognized by the bank.

FIC argues that the $377,000 that Flores admitted to embezzling form no part of POL 1–A and that it is unreasonable to make the inference that because Flores stole $377,000, he must have also stolen the $353,000 claimed in POL 1–A. According to FIC, Oriental's theory that Flores did so by cashing checks is not supported by any evidence, as admitted by Valladares and Martinez Margarida. Additionally, FIC states that for the $239,421, the bank had all the documents it needed to collect from customers and therefore, Oriental lost nothing of this amount as a sole or direct cause of Flores' actions. To support this allegation, FIC points to the testimony of Valladares, who stated that in spite of Flores' actions, the bank reversed the customers' accounts for the amounts of the "bad checks" and had the necessary documentation to collect that money from them. Oriental replies that contrary to

FIC's contention that the bank had the actual "bad checks" making up the $239,421 in its possession, Oriental had no support for that asset since the entries of the "bad checks" were left in the subsidiary listing so that Flores could keep said balance artificially inflated in order to utilize the AR/RC general ledger account to cover up the misappropriation or loss of assets to the bank, in the same way he did to steal the $377,000. Oriental points to Martinez Margarida's testimony that the bank had no support for that asset.

As to the $166,750, which is the portion of the imbalance that was caused by improper entries for which the documents needed to collect from customers could not be found, FIC argues that the loss was due to the negligence of employees other than Flores, so Flores' dishonest act was not the sole or direct cause of that loss. Oriental counters, stating that the evidence proffered as to the $166,750 proved that Flores had the responsibility of investigating all journal entries in the general ledger, whether he made them or not, and of obtaining the required supporting documents. Oriental argues that, as with the $239,421, Flores was keeping an inflated balance of $166,750 to cover up misappropriation or loss of assets to the bank in the same way he used to steal the $377,000. According to Oriental, it was reasonable for the jury to make the inference that Flores stole the $353,219 because it proved that the scheme admittedly utilized to steal the $377,000 was the same by which the $353,219 was lost.

■ We are dealing here with contradictory evidence and reasonable inferences. Regarding the $239,421, there is contradictory evidence as to whether Oriental had the documentary support for it. While one testimony shows that it did, the other one shows it did not. When, as here, there is contradictory evidence on a given

fact, the jury is free to credit whichever testimony it deems more reliable. In this case, the jury believed that Oriental could not recover the amounts corresponding to the imbalance in the AR/RC account. The Court understands that this finding is sustained by the evidence presented. The Court also disagrees with FIC's argument as to the $166,750. While FIC states that the journal entries were made by someone other than Flores and that therefore, the loss cannot be attributed to Flores, there was evidence that Flores was the person responsible for investigating and reconciling those accounts. Based on Oriental's evidence, a reasonable inference could be made that Flores was involved in the creation of the imbalance of $166,750.

Moreover, it should be clarified that Oriental did not have to present direct evidence of misappropriation by Flores, i.e. evidence of Flores cashing checks, in order to prove that the scheme regarding the AR/RC account was meant to cover up a misappropriation by him in the amount of the imbalance. This fact could be drawn from the circumstantial evidence presented: that Flores admitted to stealing $377,000 using a scheme similar to that used to create the $353,000 imbalance in the AR/RC account. The fact that Flores admitted to the $377,000 and not to the $353,000 in no way makes the inference irrational.

Accordingly, the Court holds that Oriental presented sufficient evidence on each of the elements it was required to prove under the bond to support the jury's finding on POL 1–A. Because the verdict had a sufficient legal basis, FIC's motion to enter judgment as a matter of law must be denied. Moreover, FIC's motion for new trial also fails. Even if the Court would have arrived at a different conclusion regarding POL 1–A, it understands that the verdict was a rational verdict that does not "shock the conscience" or otherwise constitute a miscarriage of justice.

### B. POL 2–A

■ As to POL 2–A, which claimed the amounts spent by Oriental in investigating POLs 1–A, 3–A and 1–B, FIC contends that the evidence does not sustain the verdict of $100,000, but only one of $84,965 because the difference ($15,035) corresponds to the investigation of POL 3–A, which was not covered. Oriental, however, argues that the jury verdict on POL 2–A should not be reduced because a total of $101,873 was spent on work exclusively related to POL 1–A. The Court has reviewed the evidence related to POL 2–A and finds that the evidence presented supports the verdict for $100,000. The documents in Joint Exhibits XII and XVII show two summaries of the PricewaterhouseCoopers fees related to the investigation of POL 1–A, one for $84,965 and another for $101,873. All the quantities are the same in both except for one. While in the first summary, an amount of $28,221 appears identified as "unbilled charges" of 212 hours invested, an amount of $45,129 appears in the second summary identified as "Invoice No. 876854–7535–01" dated 9/19/99 for 370 hours. Nowhere in those documents does it say that $15,035 was to be attributed to the investigation of POL 3–A nor can such a conclusion be drawn from the documents. FIC does not point to any specific information contained therein or elsewhere which would allow the Court to determine such was the case. Since the bond was limited to $100,000 and Oriental spent in excess of said amount, the first jury correctly awarded $100,000 under POL 2–A.

### C. Bad Faith or "Dolo"

■ Next, FIC contests the first jury's finding that it acted with bad faith ("dolo"). Under Civil Law, the English

language notion of "bad faith" is encapsulated by the concept of "dolo." *Canales v. Pan American*, 112 P.R.Dec. 329, 340 (1982). "Dolo entails a malicious intent to do harm, and is thus differentiated from mere negligence." *Event Producers, Inc. v. Tyser & Co.*, 854 F.Supp. 35, 38 (D.P.R. 1993) *citing* 19 Q.M. Scaevola, Código Civil, 617 (2d Ed. 1957). Under Puerto Rico contract law, bad faith ("dolo") can be manifested in the performance of an obligation. 31 P.R.Laws Ann. Tit. 31 § 3018; *Marquez v. Torres Campos*, 111 P.R.Dec. 854 (1982). A party acts with bad faith ("dolo") when it "knowingly and intentionally, through deceitful means, avoids complying with its contractual obligation." *Generadora De Electricidad Del Caribe, Inc. v. Foster Wheeler*, 92 F.Supp.2d 8, 18 (D.P.R.2000). It is the voluntary and conscious breach of a legal duty. *Marquez*, 111 P.R.Dec. at 865. Moreover, bad faith ("dolo") is never presumed. *See Miranda Soto v. Mena Ero*, 109 P.R.Dec. 473, 478 (1980); *Mayaguez Hilton Corp. v. Betancourt*, 156 P.R.Dec. 234 (2002). Whoever asserts the claim of bad faith ("dolo") has the burden of proof and may prove it either directly or through circumstantial evidence, like any other fact. *Id.* Under the bonds, FIC had the obligation to conduct a reasonable investigation of the claims submitted and to honor a claim if it was covered under the bond.[15] Therefore, to succeed in its claim of bad faith ("dolo"), Oriental had to prove that FIC knowingly and intentionally avoided compliance with these duties.

■ FIC argues that there was insufficient evidence for the first jury to find that it acted in bad faith. The juries in this case determined that POLs 3–A and 1–B were appropriately denied and according to FIC, no bad faith can attach to correctly denying these claims. To substantiate its allegation, FIC itemizes certain evidence presented by Oriental to prove bad faith in the first trial and responds to each item of evidence. Oriental, however, claims that the totality of the circumstances shows that FIC incurred in "textbook" bad faith because it knowingly and intentionally, through deceitful means, avoided complying with its contractual obligations.[16] Accordingly, Oriental offers evidence of bad faith admitted by FIC during the process of investigating Oriental's claims [17] as well

---

15. The first jury was instructed on FIC's duty to carry out a reasonable investigation:

Puerto Rico law requires an insurance company to carry out a reasonable investigation based on the information available prior to denying a claim. The law also prohibits an insurer from misrepresenting the facts of the terms of a policy relative to a coverage in dispute refusing to confirm or deny coverage of a claim within a reasonable term after the loss statement is completed and not to attempting in good faith to make a rapid, fair and equitable adjustment of a claim when responsibility is clearly present. These requirements are implicitly incorporated into every insurance contract. Therefore, if [FIC] did not carry out a reasonable investigation prior to denying Oriental's claim, then [FIC] breached its obligations under the bond. However, if you find that there is no coverage, any such breach is immaterial.

(See Docket No. 241, Instruction No. 22).

16. Oriental also states that in its Amended Complaint, it did not set forth separate claims for breach of contract and bad faith and clarifies that there is no law in Puerto Rico that provides for an independent cause of action against an insurance company for bad faith refusal to settle a claim. This issue was already addressed by the Court. *See supra* note 6.

17. Oriental lists the following as admitted by FIC:
1. FIC requested large amounts of documents and information, many of which were protected by privileges, was confidential or were not pertinent to OFG's claims. See First Trial Joint Exhibit XIV.
2. FIC objected to the form of the Proof of Loss document submitted by OFG, but never bothered to furnish OFG an acceptable form. See First Trial Joint Exhibit XIV.

as evidence of bad faith admitted during the first trial in this case.[18]

3. FIC objected to the form of oath submitted in support of the Proofs of Loss, but never bothered to furnish OFG an acceptable form. See First Trial Joint Exhibit XIV.

4. FIC refused to ever confirm an employee dishonesty claim. First Trial Exhibit VI.

5. FIC delayed its decision on Oriental's claims alleging it needed the same time taken by Oriental to present its Proofs of Loss without providing any justification. First Trial Exhibit 59.

6. FIC initially created a reserve of $100,000 in the file that was opened for Oriental (First Trial Exhibit 63), but decided to hold off on making payment thereto as leverage for FIC (First Trial Exhibit 66), knowing that this was a gross act of bad faith. FIC then instructed its claim manager not to paste this e-mail in the file. First Trial Exhibit 66.

7. As of December 8, 1999, when only Oriental's Proof of Loss 1-A had been filed, and FIC's evaluation was practically commencing, FIC was already considering a legal action of a declaratory judgment nature against Oriental. First Trial Exhibit 64.

8. As of June 27, 2000, FIC was considering "preemptive litigation" against Oriental, but still had not provided Oriental with a decision. First Trial Exhibit 100.

9. On June 30, 2000, Oriental was pressing FIC on a decision as to its Proofs of Loss. First Trial Exhibit 102. In response thereto, in a letter dated July 5, 2000, FIC rejected Oriental's bad faith concerns and notified Oriental that "at this time FIC is still in the process of evaluating the claims submitted by OFG and we expect to notify you of the results of the claim investigation shortly." First Trial Exhibit Joint XX. (Emphasis supplied). This was clearly false because FIC had recognized at least as of June 27, 2000, that its claim investigation was complete, and were considering other tactical strategic moves to gain advantage over Oriental, it's insured. First Trial Exhibit 100.

18. Oriental lists the following as additional evidence of bad faith ("dolo") by FIC:

1. Oriental presented evidence of dishonest and fraudulent acts, including admissions of Miguel Flores, but FIC ignored that evidence. Tr. 7/28/05, p. 8, lines 14-25; p. 9, lines 1-12.

2. FIC decided that there was no evidence that any of the claimed funds were disbursed to Flores, based on its conclusion that but for the money Flores has admitted to stealing, none of the monies claimed were traceable to Flores. This, notwithstanding the fact that the Bonds clearly do not require this as a condition to coverage, and moreover, Flores had admitted cashing checks, which are, of course, impossible to trace. Tr. 7/28/05, p. 8, lines 13-25; p. 10, lines 1-17.

3. FIC ignored the fact that Flores was the only person in charge of the subsidiary of the accounts receivable-returned checks. Tr. 7/28/05 at p. 11, lines 1-3.

4. FIC took the position that Oriental had not incurred in a loss, but rather the correction of inflated assets, which was precisely the issue: money that Flores stole from one side and put in on and concealed it in the Accounts-Receivable returned checks. Tr. 7/28/05 at p. 11, lines 14-25 and p. 12, line 1.

5. FIC took the position that a write-off is not a loss, when Oriental had demonstrated that funds had been stolen from Oriental and concealed in the Accounts-Receivable returned checks. Tr. 7/28/05 at p. 12, lines 2-25 and p. 13, lines 1-15.

6. FIC made reference to the acts, omissions and schemes perpetrated by Flores, González and Ayala, merely as "alleged", ignoring admissions of Flores, González and Ayala. Tr. 7/28/05, p. 13, lines 16-25, p. 14, lines 1-17.

7. FIC stated that Oriental contended that the former employees had improperly manipulated the FHLB and Citibank account reconciliations, and that a significant number of outstanding reconciling items as far back as 1993 were eliminated. This is false, as there were no reconciling items going back to 1993. This fact was admitted by the former employees who had improperly manipulated the bank's cash account reconciliations, and this information had been provided to FIC. Tr. 7/28/05, p. 14, lines 20-25, p. 15, lines 1-20.

8. FIC stated that Oriental had not shown evidence of disbursement of the lost funds to any of the alleged participants or anywhere. This is untrue, because as part of Proof of Loss 3-A, evidence was provided of wire transfers, disbursements from its cash accounts. Tr. 7/28/05, p. 16, lines 1-25, p. 17, line 1.

9. FIC refers to alleged problems with the bank's reconciliations dating back at least to 1992 and claims they had reached a staggering sum as of 1995. This is completely false. Tr. 7/28/05, p. 17, lines 2-22; p. 19, lines 8-15.

10. FIC contends that Oriental's write-off of $3,442,450 does not support the allegation

As to the admissions itemized by Oriental, FIC states that it admitted certain facts listed by Oriental in relation to the process of investigation of the claims precisely because they are not evidence of bad faith. Regarding the other items of evidence, FIC points out that they are mostly related to the POLs that the juries found were properly denied by FIC and therefore, no bad faith can attach. The remaining items of evidence referred to by Oriental are irrelevant, according to FIC, because they come from the testimony of Valladares, which was limited to whether he agreed with FIC's denial letter. FIC's position is that the mere fact that Valladares disagreed with the conclusions stated in FIC's denial letter does not support a claim of bad faith.

Oriental argues that because the Court has already held that the finding of bad faith ("dolo") by the first jury was cumulative for all the claims, FIC's argument that the Court cannot take into account evidence of bad faith as to the POLs which were found to have been rightfully denied, is without merit. According to Oriental, it does not follow that because the second jury found for FIC as to POL 3–A, there is insufficient evidence of bad faith to support the first jury's finding.

■ As stated above, a party acts with bad faith ("dolo") if it (1) "knowingly and intentionally, through deceitful means," (2) avoids complying with its contractual obligation. Accordingly, a finding of bad faith ("dolo") must be based on evidence that a party avoided compliance with its contractual obligation and that it did so through deceitful means. The act of denying coverage under the bond, however, is not by itself an act of bad faith. *See Quinones Lopez v. Manzano Pozas*, 141 P.R.Dec. 139, 174–75 (1996). "[O]nly when seen in light of the totality of circumstances that surround such refusal, can an indication of the insurer's bad faith be perceived." *Id.* at 175. The specific instruction given to the jury in the first case regarding bad faith ("dolo") was the following:

There is bad faith ("dolo") in the performance of the contract when one of the contracting parties wilfully and voluntarily does not comply with his obligations knowing that he is acting unfairly. It is the conscious, deliberate purpose of avoiding the normal per-

---

that a loss occurred. That is precisely what Oriental's evidence shows. Tr. 7/28/05, p. 19, lines 16–25, p. 20, lines 1–13.

11. FIC makes reference to Flores and Ayala's acts of manipulating the cash accounts as "adjustments". These acts are clearly not adjustments. Tr. 7/28/05, p. 20, lines 17–25; p. 21, lines 1–6. See also p. 24, lines 19–25; p. 25, lines 1–11.

12. FIC insists that Oriental has not submitted evidence of dishonest and fraudulent acts. Tr. 7/28/05, p. 21, lines 7–25; p. 22, lines 1–19.

13. FIC refers to the manipulation here in issue as not the best method of resolving the problem, when there is only one correct method of doing reconciliations, and that is by conducting the necessary investigation. Tr. 7/28/05, p. 22, lines 23–25; p. 23, lines 1–25; p. 24, line 1.

14. FIC also refers to the manipulation here in issue as an "error of judgment", when it was clearly demonstrated that they were intentional and premeditated acts. Tr. 7/28/05, p. 24, lines 2–18.

15. FIC referred to Oriental claim's related to its mortgage account as "tenuous", ignoring volumes of documents, records, entries, etc., that supported the same. Tr. 7/28/05, p. 25, lines 18–25, p. 26, lines 1–10.

16. FIC makes reference to the "fact" that the money can be found in the other account in connection with Oriental's claim as to its mortgage account. This is simply absurd and false. Tr. 7/28/05, p. 26, lines 11–25; p. 27, lines 1–15.

17. Finally, FIC charged Oriental as being frivolous and threatened it with filing a complaint with the Office of the Insurance Commissioner. This was preposterous. Tr. 7/28/05, p. 27, lines 20–25; p. 28, lines 1–24.

formance of the contract. Bad faith ("dolo") involves malice, the contention to do harm to another's person or property.

(Docket No. 241, Instruction No. 20).

Based on the above stated framework, the Court must conclude that the evidence listed by Oriental as evidence of bad faith admitted by FIC does not amount to "dolo." First, FIC was well within its rights under the bonds in requesting documents and information related to the POLs. The fact that some of those documents or information was protected by privileges, was confidential, or turned out to be irrelevant to Oriental's claims does not prove bad faith ("dolo"). Similarly, FIC was entitled to object to the form of the Proof of Loss document if it was not in compliance with the requirement under the bond that it be sworn.[19] Moreover, Oriental could not expect FIC to confirm an employee dishonesty claim at a time when the evidence and information was incomplete. Until correctly submitted, it was just a potential claim. Next, FIC's statement that it could take a similar amount of time to complete an investigation as extended by FIC to Oriental is not probative of bad faith; it seems fair that leniency with the terms go both ways. Regarding the claim that FIC initially created a reserve of $100,000 in the file that was opened for Oriental, but decided to hold off on making payment thereto as leverage for FIC, and also instructed its claim manager not to paste this e-mail in the file, FIC has offered an explanation that dissipates any skepticism for such conduct. FIC explains that the e-mail presented by Oriental to prove that FIC withheld payment to Oriental as leverage is not proof of bad faith because the person who sent it, John Vias, did not have the authority to issue coverage opinions, FIC did not rely on that e-mail in its later decision to deny coverage, and FIC had not decided the coverage issue at the time the e-mail was sent. This explanation is supported by evidence presented to the jury. See Tr. 9/7/05, pp. 26–30. Accordingly, these manifestations cannot be interpreted as evidence of FIC's purposeful avoidance of its contractual obligation. Neither is it proof of bad faith the fact that FIC was considering filing a legal action of a declaratory judgment nature at the beginning of the investigation and again nearly three weeks before issuing its decision regarding coverage, as FIC was within its rights to file such an action before issuing a decision. Moreover, the statement by FIC on July 5, 2000 that "at this time FIC is still in the process of evaluating the claims submitted by OFG and we expect to notify you of the results of the claim investigation shortly" is not clearly false. The fact that FIC recognized at least as of June 27, 2000 that its claim investigation was complete and was discussing strategies regarding the issuance of its decision is not inconsistent with its statement. The same document (Agenda of Meeting with Rolando Orama) used by Oriental to prove that the claim investigation was complete states as an item of discussion "content of written decision" and said meeting was held shortly before the issuance of FIC's decision in July 12, 2000. *See* First Trial, Exh. 100.

As to the other evidence listed by Oriental, the Court finds that it is not probative of bad faith. All of the evidence Oriental points to comes from the testimony of Valladares regarding his disagreement

---

**19.** Oriental also states that FIC did not furnish the acceptable form for the POL and the form of the oath, making reference to Joint Exhibit XIV. The Court has not found evidence of a failure to provide the forms in the referenced document. In any case, not furnishing the appropriate forms is not probative of bad faith ("dolo").

with FIC's decision letter. According to Valladares, Oriental provided FIC with the information needed to determine the validity of Oriental's claims, but FIC ignored the information, found the claims frivolous, and even threatened to inform the Insurance Commissioner's Office if Oriental did not withdraw the claims. As a whole, Valladares' testimony does not prove that FIC "knowingly and intentionally, through deceitful means, avoided complying with its contractual obligation." Valladares may have disagreed with the statements made by FIC in its letter, but said disagreement does not prove that FIC acted with bad faith ("dolo") in its investigation of Oriental's claims or in its denial of the claims.

Specifically, there is no bad faith in FIC referring to Flores' or the other employees' acts in relation to the POLs as "allegedly fraudulent" in view of their admissions because although they admitted their actions, it was reasonable for FIC to conclude that the actions were not the fraudulent acts required under the bonds. Regarding Flores in particular, it was not an act of bad faith for FIC to state that there was no evidence that any of the claimed funds were disbursed to him. Because the money Flores admitted to embezzling formed no part of the POLs, Oriental sought that an inference be made that he embezzled the amounts claimed. As stated above, the jury drew such an inference in finding for Oriental on POL 1–A, but it was entirely reasonable for FIC, in the absence of direct evidence of embezzlement, to make those statements. Moreover, FIC's position that Oriental had not incurred in a loss as a result of Flores' actions was also reasonable, specially because the question of loss was a close one, even under POL 1–A. Similarly, stating that Flores was responsible for a only some of the unreconcilable items is not a completely incorrect statement, even if he was the person in charge of the

accounts and a reasonable inference could be made that he was involved in embezzling the amounts claimed. Additionally, FIC's statement that the bank's problems with reconciliations dated back to 1992 and had reached a staggering sum by 1995 is not completely false, as Oriental claims. The fact that Oriental was not claiming moneys dating back to 1992 has nothing to do with that statement. Moreover, FIC's statement that the write-off of $3.4 million does not support the allegation that a loss occurred (as claimed in POL 3–A) is supported by the evidence, as previously discussed. Similarly, the statement that Oriental had not shown evidence that under POL 3–A, there were disbursements of the lost funds, is based on adequate grounds.

The remaining evidence mentioned by Oriental is equally unavailing. Valladares' disagreement with FIC's characterization of the employees' manipulations as "adjustments" that were "not the best method of resolving the problem" but an "error of judgment" is, far from evidence of bad faith, a displeasure with FIC's outlook on the claims. Moreover, the description of the pending reconciling items as a "staggering sum," is not unreasonable in light of the evidence and in any case, is so debatable and subjective that it cannot be probative of bad faith. Similarly, the description of Oriental's mortgage account claim as "tenuous" is supported by evidence and confirmed by a jury verdict. Also, FIC's comment that, regarding POL 1–B, there was no evidence that money was lost because the money could be found in other accounts is not evidence of bad faith. Valladares would describe the situation with the accounts differently, but the description by Oriental is not so absurd as to be probative of bad faith. Finally, labeling Oriental's claims as frivolous and threatening to file a complaint with the Office of the Insurance Commissioner is, under the

circumstances, probative of FIC's strong belief that it was correct in its decision, not evidence of bad faith. Just like Oriental is free to question FIC's denial, so is FIC free to question Oriental's insistency in securing coverage. Essentially, Valladares' testimony challenges the factual underpinnings of FIC's decision to deny the claims, offering a different interpretation of the evidence submitted by Oriental. FIC's statements, however, in no way prove that FIC ignored evidence presented by Oriental or that FIC intentionally misconstrued the evidence.

Based upon the evidence presented, a reasonable jury could reach only one result regarding bad faith ("dolo") and that is that FIC did not act with bad faith in the handling and denial of Oriental's claims. FIC's conduct during the investigation was reasonable and even lenient towards Oriental. The evidence shows that FIC conducted a prudent investigation and that it did so as expeditiously as possible under the circumstances. Moreover, FIC's decision to deny coverage was supported by the facts presented in the POLs and by the investigation. FIC's actions are those of a diligent insurer and cannot be reasonably interpreted as deceitful means to avoid compliance with contractual obligations. Accordingly, on the basis of the evidence presented, a rational jury would not have found that FIC acted with bad faith ("dolo"). Because Oriental failed to make its case regarding bad faith ("dolo"), the verdict in its favor cannot stand. FIC is entitled to judgment as a matter of law on this issue.

### D. Consequential Damages

■ As previously stated, Puerto Rico law provides that when a party acts with bad faith ("dolo") in breaching a contract, the aggrieved party may recover all damages that originate from the nonfulfillment of the obligation. *See* P.R. Laws Ann. Tit. 31 § 3024. In the absence of a finding of bad faith ("dolo"), "[t]he losses and damages for which a debtor in good faith is liable, are those foreseen or which may have been foreseen, at the time of constituting the obligation, and which may be a necessary consequence of its nonfulfillment." Id. Accordingly, regardless of whether a party acts with bad faith ("dolo") or not, in order to recover damages, the aggrieved party must prove that the damages claimed resulted from the breach. Here, the determination of damages is based on the previous determination that FIC breached its contract with Oriental in wrongfully denying the claims asserted in POL 1–A and 2–A, albeit without bad faith ("dolo"). Accordingly, Oriental is entitled to recover foreseeable damages which resulted as a necessary consequence of FIC's breach.[20]

■ The jury in the first trial rendered a verdict granting Oriental consequential damages in the amount of $7,078,640.60. This amount represents image campaign and public relations expenses, legal expenses, accounting expenses and damage to Oriental's brand name. The Court has carefully reviewed the evidence presented by Oriental during the first trial regarding consequential damages. It is clear from said evidence, as well as from Oriental's pleadings, that all of the consequential damages sought in this case are linked to the issuance of the restatement.

Regarding to the damages for loss of brand value, Oriental's expert, Jeffrey Parkhurst, testified at length about his finding that as a result of the restatement issued by Oriental in July 2000, the bank

---

**20.** A finding of bad faith ("dolo") would have excused Oriental from proving foreseeability, but not causation.

suffered damages amounting to $14.5 million. He specifically and repeatedly stated that the damage to Oriental's brand value occurred as a result of the restatement. *See* Tr. 8/11/05, p. 126, lines 6–9; p. 128, lines 4–9; p. 134, lines 24–25 and p. 135, lines 1–6; p. 138, line 9–12. Even when asked whether other events could have caused the damages he reported, Parkhurst insisted that the issuance of the restatement was the event which caused them. *See* Tr. 8/11/05, p. 141, lines 8–21; p. 156, lines 4–13. Moreover, Parkhurst stated that the damage would have been the same regardless of the breakout detail of the restatement. *See* Tr. 8/11/05, pp. 160–165. According to Parkhurst, no precise amount of the $14.5 million can be identified as the damage chargeable to the denial of Oriental's claims by FIC because consumers react to the fact that a large restatement occurred without knowing the particulars of the restatement. *See* Tr. 8/11/05, p. 164, lines 23–25; p. 165, lines 1–6.

As to the damages resulting from image campaign and public relations expenses, legal expenses and accounting expenses, these too are tied to the preparation of the restatement as per the evidence presented by Oriental. Valladares testified that all the invoices regarding these services were specifically related to the handling of the restatement of Oriental's financial statements. *See* Tr. 7/27/07, pp. 31–32. Since all of the consequential damages in this case are linked to the issuance of the restatement and nothing else, in order to recover those damages, Oriental needed to prove that the issuance of the restatement was foreseeable and resulted as a necessary consequence of FIC's wrongful denial of its claims.

In its motion, FIC states that there is insufficient evidence for the jury to find that FIC's denial of POL 1–A, by itself,

resulted in any consequential damages to Oriental. To prove this, FIC relies on Oriental's theory that its consequential damages were all derived from the need to issue a restatement of its financial reports as well as on the testimony of Valladares in the first trial, which was the only evidence in the trial as to how large a loss was required to trigger a restatement. Valladares stated that of the $2.1 million of adjustments made by Oriental in 2000, $1.8 million applied to the 2000 fiscal year and $300,000 belonged to previous years. Furthermore, he stated that the $300,000 loss, by itself, would not have warranted a restatement because it is an immaterial amount. FIC takes this testimony to argue that if $300,000 is immaterial, so is the $353,219 which was claimed in POL 1–A. Therefore, it would not have been necessary to make a restatement as a result of the denial of POL 1–A. If no restatement was necessary as a result of FIC's denial of POL 1–A, no consequential damages could have stemmed from the denial of said claim.

FIC contends that in the end, Oriental did not carry its burden of proving that FIC's improper denial of the POLs caused the restatement and consequently, the damages claimed in this case. Moreover, FIC sustains that it is a serious stretch to argue that it should have foreseen that if it denied a $453,219 claim,[21] an institution like Oriental would be forced to restate its earnings, spend over a million dollars on accountants, lawyers and public relations, and lose $6 million in value to its brand. FIC concludes that the absence of evidence of causation to support the first jury's verdict of over $7 million in consequential damages requires that the Court enter judgment as a matter of law in favor of FIC, dismissing the jury's award of consequential damages. In the alterna-

---

**21.** POL 1–A was for $353,219 and POL 2–A     for $100,000.

tive, FIC prays that the Court order a new trial limited to the issue of the amount of consequential damages.

Oriental interprets Valladares' testimony differently, of course. According to Oriental, Valladares was not being specifically questioned as to whether Oriental would have issued a restatement of it financial earnings exclusively based on the denial of POLs 1–A and 2–A. Instead, his testimony referred to certain amounts not related to the denial of the POLs and corresponding to several years. Accordingly, Oriental sustains that any argument as to whether it would have made a restatement under any set of circumstances is purely speculative. As to the connection between FIC's denial of the claims and the restatement, it is Oriental's contention that the damages are not remote and are directly traceable to FIC's breach because Oriental suffered damage to its brand as a consequence of issuing a restatement. Oriental states that even if it was not foreseeable that Oriental would have issued a restatement based on the denial of a POL worth $300,000, the restatement was made and damage to Oriental's brand resulted so FIC is responsible to Oriental. Finally, Oriental argues that a jury verdict on an issue of causation should be reviewed with great deference.

After reviewing the record, the Court was unable to find any evidence that had to do with the necessity of the restatement as a result of FIC's denial of POL 1–A. Oriental had the burden of proving not only that it suffered damages and what those damages amounted to, but also their relation to FIC's wrongful denial of its claims. Having proven that the only claim wrongfully denied was that contained in POL 1–A, Oriental had to also prove that the restatement was the result of said

denial. However, the only evidence of what amount in losses would trigger a restatement was the testimony of Valladares. Of course, the evidence is not on point, as he was not specifically questioned as to whether Oriental would have issued a restatement exclusively based on the denial of POLs 1–A and 2–A. However, even though his testimony referred to certain amounts not related to the denial of the POLs and corresponding to several years, Valladares did state that the amounts of $300,000 in corrections to prior years and $2.2 million of a favorable tax adjustment would not, by themselves, be material to require a restatement. This uncontroverted evidence, coupled with the fact that there is no further evidence on record to prove causation between the denial of POL 1–A and Oriental's damages claims, leads the Court to conclude that Oriental failed to meet its burden in proving that the issuance of the restatement was foreseeable or even related to the denial of POLs 1–A and 2–A.[22] It is clear that a reasonable jury could reach only one result based upon the evidence and that is that no consequential damages resulted from FIC's wrongful denial of the POLs. Although Oriental is, of course, entitled to specific performance (coverage) of its claims under POL 1–A and POL 2–A, it may not recover damages as a result of the breach.

Having determined that consequential damages were not proven, there is no need for the Court to entertain the parties' remaining arguments regarding damages.

### III. Pre–Judgment and Post–Judgment Interest

■ Oriental having ultimately prevailed on POL 1–A and POL 2–A, it is entitled to prejudgment interest on that

---

**22.** Accordingly, we arrive at this conclusion irrespective of the finding of lack of bad faith

("dolo").

portion of the verdict pursuant to Article 1059 of the Puerto Rico Civil Code, which states that "[i]ndemnity for losses and damages includes not only the amount of the loss which may have been suffered, but also that of the profit which the creditor may have failed to realize." P.R.Laws Ann. Tit. 31 § 3023. FIC acknowledges this right. Said interest shall be computed since January 31, 2000 which is when Oriental submitted a duly sworn POL to FIC and FIC's duty to pay the claim was triggered.[23]

Oriental also seeks prejudgment interest pursuant to Rule 44.3(b) of the Puerto Rico Rules of Civil Procedure. However, Oriental is not entitled to receive this type of prejudgment interest because it requires a finding of obstinacy by FIC and there is no basis here for such a finding.

Finally, Oriental is also entitled to post-judgment interest, which shall be computed pursuant to federal law in accordance with 28 U.S.C. § 1961.

### CONCLUSION

For all the reasons stated above, FIC's "Renewed Motion for Judgment as a Matter of Law Pursuant to Fed.R.Civ.P. 50(b) or, in the Alternative, for a New Trial Pursuant to Fed.R.Civ.P. 59" (Docket No. 350) is GRANTED IN PART and DENIED IN PART; and "Oriental's Motion to Set Aside the 2007 Jury Verdict, for New Trial, and to Alter or Amend Judgment" (Docket No. 351) is GRANTED IN PART and DENIED IN PART. Judgment shall enter accordingly.

IT IS SO ORDERED.

---

**23.** The original POL was submitted on October 26, 1999, but did not comply with the requirement of the bond inasmuch as it was not sworn. POL 2–A is derivative of the main claim, so the same date of accrual of interest applies to it.